Docket No. 98996.

IN THE
SUPREME COURT
OF
THE STATE OF ILLINOIS

---

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANDREW URDIALES, Appellant.

*Opinion filed February 16, 2007.–Modified on denial of rehearing May 29, 2007.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Garman, and Burke concurred in the judgment and opinion.

Justice Kilbride concurred in part and dissented in part, with opinion.

## OPINION

Defendant, Andrew Urdiales, was indicted in the circuit court of Livingston County for the first degree murder of Cassandra Corum. See 720 ILCS 5/9–1(a) (West 2004). The State subsequently filed notice of intent to seek the death penalty. Defendant tendered a plea of guilty but mentally ill; however, the State disputed the existence of mental illness. The parties subsequently agreed to an evidentiary hearing in which the trial court simultaneously received evidence concerning the factual basis for the plea and conducted a bench trial on the issue of guilt/innocence. The trial court ultimately rejected

defendant's plea of guilty but mentally ill and his bench trial defense of insanity. The court found defendant guilty of first degree murder. Defendant waived a jury for the eligibility stage of capital sentencing, and the circuit court subsequently found defendant eligible for the death penalty based upon prior murder convictions. See 720 ILCS 5/9–1(b)(3) (West 2004). Defendant elected jury consideration for the aggravation/mitigation phase of sentencing. After considering evidence in aggravation and mitigation, the jury concluded that death was the appropriate sentence. See 720 ILCS 5/9–1(g) (West 2004). The circuit court thereafter sentenced defendant to death. Because defendant was sentenced to death, his appeal was brought directly to this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603.

On appeal, defendant contends that (1) the trial court erred in ordering defendant restrained during trial, and instructing the jury that "security measures" had been implemented; (2) the trial court's repeated on-the-record criticisms of recent appellate court opinions deprived defendant of due process and fundamental fairness; (3) the trial court denied defendant due process and fundamental fairness when the court disparaged the motives and conduct of attorneys from the Office of the State Appellate Defender; (4) the trial court abused its discretion in rejecting defendant's plea of guilty but mentally ill; (5) the trial court's verdict of guilty, instead of guilty but mentally ill, was against the manifest weight of the evidence; (6) the trial court's statement to the sentencing jury, that the court had rejected defendant's insanity defense at trial, and the prosecutor's reference thereto in closing argument, "improperly demeaned the defendant's mitigating evidence of mental illness, and punished defendant for exercising his constitutional right to present a defense"; (7) the trial court erred in denying defendant's request to submit experts' reports to the jury; (8) the trial court erred in improperly assisting the prosecutor in cross-examining a witness and thus establishing a foundation for a prosecution exhibit; (9) the prosecutor's closing argument denied defendant due process; (10) the sentencing jury should have been specifically instructed that a background of extreme emotional or physical abuse is a mitigating factor; and (11) the Illinois death penalty statute violates principles announced in *Apprendi* in that it does not require application of the reasonable doubt standard at the second stage of capital sentencing proceedings.

We set forth, hereafter, a summary of the evidence pertinent to a discussion of the issues raised by defendant.

BACKGROUND

On July 14, 1996, police found the nude body of an unidentified woman floating in the Vermilion River in Livingston County. The woman's wrists had been handcuffed, her ankles were bound with duct tape, and her mouth was covered with duct tape. An autopsy revealed that the victim had died of a single gunshot wound to the head and seven stab wounds to the head and chest. The body was later identified as that of Cassandra Corum. Corum had been reported missing from Hammond, Indiana.

Corum's murder was subsequently linked to the murders of two young women in Cook County. The bodies of Laura Uylaki and Lynn Huber had been found in Wolf Lake, a body of water in Cook County, near the Indiana border. Each of those victims had also been shot in the head and stabbed multiple times. Ballistics tests indicated that all three victims were killed by bullets fired from the same gun.

On April 1, 1997, a police officer in Hammond, Indiana, responded to a call involving defendant and a prostitute. The prostitute told the officer that defendant had wanted to take her to Wolf Lake, handcuff and duct tape her, and have sex with her. In November of 1996, the same officer had arrested defendant for unlawful possession of a firearm, and at that time had found rolls of duct tape in defendant's truck. The Hammond police officer forwarded the information he had obtained to Chicago detectives, who subsequently obtained the gun seized from defendant as a result of his November 1996 arrest. Testing revealed that defendant's gun had fired the bullets that killed Cassandra Corum, Laura Uylaki, and Lynn Huber.

On April 22, 1997, Chicago police officers approached defendant, who voluntarily agreed to talk with them. At the police station, detectives showed defendant photographs of Corum, Uylaki, and Huber, but defendant claimed he did not recognize them. During the questioning, defendant indicated he had bought his handgun approximately four or five years earlier from a gunshop in Calumet City, and it had been under his exclusive control until it was confiscated in Hammond, Indiana. When officers told defendant the

-3-

three women had been killed by bullets fired from his gun, defendant paused for a minute, took off his security guard badge, started taking off his shoelaces, and said, "Well, I guess I'm not going to work today." Defendant then provided the police with detailed confessions to all three Illinois murders. Without prompting from the police, defendant also mentioned "some matters" that California authorities "might be interested in." Defendant subsequently confessed to the murders of Robbin Brandley, Julie McGhee, Mary Ann Wells, Tammy Erwin, and Denise Maney, as well as the kidnapping, rape, and attempted murder of J.A., all of which were committed in California between 1986 and 1995.

The details of those offenses were provided in testimony and evidence presented at the aggravation/mitigation phase of sentencing, and will be recounted in our discussion of that portion of defendant's trial.

On March 10, 1998, a Livingston County grand jury returned a four-count indictment charging defendant with first degree murder for the killing of Cassandra Corum. In March of 2001, the State filed notice of its intent to seek the death penalty, alleging three possible eligibility factors: that the defendant had been convicted of murdering two or more individuals (720 ILCS 5/9–1(b)(3) (West 2000)), that he had killed Cassandra Corum during the course of an aggravated kidnapping (720 ILCS 5/9–1(b)(6) (West 2000)), and that the murder was committed in a cold, calculated, premeditated manner pursuant to a preconceived plan (720 ILCS 5/9–1(b)(11) (West 2000)).

Defendant was convicted of the Cook County murders, and was sentenced to death on September 3, 2002. In that case, a jury rejected claims that defendant was legally insane or mentally ill as defined in section 6–2(d) of the Criminal Code of 1961. See 720 ILCS 5/6–2(d) (West 2002). On January 10, 2003, then-governor George Ryan commuted defendant's death sentence to one of natural life in prison without the possibility of parole.

On November 3, 2003, defendant's appointed counsel in this case, Steven Skelton and James Elmore, requested that the trial judge accept the appearance of attorney Stephen Richards as additional counsel for defendant. Richards was a deputy defender with one of the State Appellate Defender's Death Penalty Trial Assistance offices (hereafter DPTA). The trial judge allowed Richards to enter his

appearance with the understanding that Skelton and Elmore would be "lead counsel" and that the court would look to them for management of the case.

Richards subsequently tendered a written entry of appearance during a hearing conducted on December 1, 2003. On that document, John Hanlon and Allan Sincox, staff attorneys of DPTA, were also listed as entering their appearance. The trial judge did not immediately notice the unauthorized addition of Hanlon and Sincox, a matter that came to the court's attention when the judge observed what he perceived as disruptive behavior in the courtroom:

"THE COURT: Who is the gentleman behind Mr. Richards, because I am getting tired of the expressions on his face and his gyrations. *** And now he is quite red-faced and he seems very angry.

Sir, who are you?

MR. SINCOX: My name is Allan Sincox. My appearance is now on file. Mr. Richards filed an appearance with my name listed on it today. I have been assisting with this case.

THE COURT: You are not an attorney in this case, sir. You are not now an attorney in this case.

Oh, I see the appearance has–well, I gave permission, Mr. Richards, for you to assist Mr. Elmore and Mr. Skelton at this relatively late date. I have not given permission for John Hanlon, Allan Sincox to do so. I have not heard from Mr. Elmore and Mr. Skelton that they want their assistance. So the way the record stands now, and I do thank you for calling that to my attention[,] Mr. Richards has been requested for assistance in this case by Mr. Skelton and Mr. Elmore. I have not heard from them as to John Hanlon or Allan Sincox. I am concerned about you, you are Mr. Sincox?

MR. SINCOX: Yes, I am, Judge.

THE COURT: I am concerned about your professional demeanor here in court today. On four or five occasions you have gripped your head and shaken your head. And it is quite–it is at least distracting to me ***.

MR. SINCOX: Well, that is my fault. And I do apologize.

-5-

THE COURT: Your apology is accepted. I didn't know you were an attorney. Quite frankly, I am shocked."

Attorney Sincox then noted that he had been involved in the trial of defendant's cases in Cook County, and he explained: "[T]here are things I find myself wanting to tell the lawyers." The court responded, "I understand the emotional factor, but you are an attorney, and you should know better." The court then clarified the status of defendant's representation, noting that "Mr. Richards is in the case; Mr. Hanlon and Mr. Sincox are not." The record indicates that the names of Hanlon and Sincox were, at some point, stricken from the entry of appearance.

At a subsequent hearing on December 23, 2003, Richards was allowed to argue various pretrial motions for the defense, without comment or objection from the trial judge. The trial court reserved ruling on two of those motions, and denied the remainder.

Later, on February 6, 2004, during a pretrial hearing attended only by the prosecutors and attorneys Skelton and Elmore, Skelton broached the possibility that he might ask the court to allow attorney Sincox to "enter his appearance for the limited purpose of deposing Dr. [Park] Dietz in California." The trial judge asked counsel, "Is this all going to get accomplished in time not to impact on the trial date?" Counsel for defendant nodded affirmatively. The court then expressed "concern" about Sincox's involvement in the case, noting that he had acted "very unlawyer-like the only time that he was here" and that he had conducted himself "in a very unprofessional manner." At that point, the prosecutor questioned why Sincox had to be involved and why Skelton and Elmore could not conduct the deposition.

Without further comment on the prosecutor's statement, the trial judge commended attorneys Skelton and Elmore for the job they had done to that point, and then stated his belief that attorneys Sincox and Richards had "an agenda far greater than" the defendant's case. He indicated he wanted to ensure that Elmore and Skelton remained in control of the case and exercised their "independent judgment." Continuing, the trial court stated:

> "I can see a deposition out there going into several areas, well, now they are objecting, and now I am supposed to rule on objections taking place out in California. I don't trust Mr.

Sincox. \*\*\* His conduct in this courtroom was most unprofessional. It is clear to me that he has an agenda far greater than Mr. Urdiales and he is motivated by that. And I am concerned that his conduct will be governed by that. \*\*\* And if he goes far afield out there, we have got a mess on our hands in terms of, well, now the deposition wasn't completed. Now we are going to certify some questions and get those back to this court. And we are moving great amounts of cases away from this calendar of mine in Livingston County. I got a heavy calendar and we are making lots of room and going through all kinds of exercises here to get this case tried in April. And I want to get it tried in April."

The trial judge observed: "It is premature to rule on this motion. It's not yet filed. If you do file it, you need to make plans. I have no problem hearing this motion by conference call \*\*\*." The court then moved on, questioning the prosecutors as to whether the reports of certain experts would be timely filed and were "on track."

The record indicates that a motion *was* later filed requesting that Sincox be allowed to enter a limited appearance to take the deposition of Dr. Dietz. On March 4, 2004, in one of many pretrial conferences, the court addressed that motion:

"THE COURT: There was a motion here with respect to Mr. Sincox. I am finding that motion rendered moot because Mr. Elmore is going to go [to California] and Mr. Sincox is not now a member of the defense team. I indicated some reluctance to increase the defense team at this point and bring in somebody new. And that issue simply goes away if Mr. Elmore is going to go to California if necessary."

MR. ELMORE: Yes, I think both Mr. Skelton and myself anticipate making a trip out there."

Defense counsel did not object to the court's statement that the motion was moot and did not take any action to obtain a ruling on the motion.

Also prior to trial, the court addressed the matter of courtroom, security. On April 19, 2004, just prior to jury selection, the court noted for the record:

"[T]he defendant is seated there at table where his hands are free. He is in street clothes. There is an eyebolt in the floor.

And there he has shackles on his legs. And that shackle is attached to the eyebolt in the floor. The jury, I believe it is correct, will not be able to see that shackling. They will be unaware of it unless Mr. Urdiales makes some noise or some motion that would call their attention to it. And I want to at least see if there is any objection on the record."

Defense counsel stated that the judge's remarks were "factual and correct," that the defendant wanted the record to reflect that he was secured in that fashion, and the defense had "no objection to it now."

The trial court then discussed two recent appellate court cases pertaining to courtroom security and restraint of defendants, noting that he "respectfully disagree[d] with both [of] those decisions," but he had to "take them into account." The trial judge also acknowledged this court's decision in *People v. Boose*, 66 Ill. 2d 261 (1977). The judge suggested that appellate court justices might not appreciate how "trial circumstances have changed," in part because some of them have "never been trial judges" and have "never practiced criminal law." The trial judge offered his observation that "[t]imes have simply changed," and that he had seen "a great deal of violence occurring in [the] courtroom," noting the presence of two prisons within the county.

The court made clear that defendant had behaved appropriately up to that point. However, the judge observed that defendant had been recently convicted of two murders and, though his death sentence had been commuted, he was still serving two life sentences. The court stated that was one factor in its decision to restrain defendant. The court also noted that defendant was in good health and had no difficulty getting around; thus, suggesting that defendant could pose a physical threat. Moreover, the court observed that the Livingston County courthouse was built in 1875 and there were "all kind of security problems" with the building and the courtroom. The judge pointed out that the courtroom was small and seating was close. He stated that two guards would be seated in the row behind the defendant. In that respect, the court observed:

"The jurors, I think, will understand that. And importantly for a reviewing court, I have learned over the years that the jurors aren't stupid. And they will be told the defendant is in custody and that certain security measures have been taken, such as the guards being here. They would expect that. And

I believe they can handle that and still give both sides a fair trial."

With that, the trial court asked: "Is there anything else on that issue that either the State or the defense wishes to bring up?" For the defense, attorney Skelton responded, "No, sir."

The court then recessed prior to the commencement of jury *voir dire*. During that recess, out of the presence of the trial judge and potential jurors, a disturbance occurred in the courtroom. Subsequently, without potential jurors present, the trial judge swore in one of the correctional officers guarding defendant in order to ascertain what had happened. The officer, Craig Valleroy, testified that defendant had turned to talk to a lady seated behind him. The officers initially thought the woman was a lawyer, but when she indicated otherwise, they told defendant he could not speak with her. Defendant then became angry. Stating, "I don't give a damn," he slapped a cup of water on the table in front of him, sending it flying, and he "threw *** stuff around." He was told to settle down, and was then physically subdued and handcuffed.

After ascertaining what had happened, the trial judge asked defendant, "Will you promise to behave yourself if I do not shackle you." Defendant did not respond to the court directly. Rather, defendant had attorney Skelton note for the record that defendant had not been shackled during proceedings in Cook County and there had been no outbursts or problems. Counsel stated: "And he is concerned about his perception of the respect he is being shown here by both the court and security personnel in the courtroom." Counsel acknowledged that he had attended defendant's trial in Cook County and that the "logistics of that courtroom and the parameters of that courtroom are somewhat different."

In response to the concerns expressed by defendant, the trial judge observed that "the world changed" for defendant with his murder convictions in Cook County, suggesting, had defendant been found not guilty there, the court "would have been doing something different here." The court also pointed out, "you are on trial here for your life." As a result of the incident, the court ordered defendant's left hand shackled under the table as well. Though the court allowed defendant's right hand to remain free, the court ordered that defendant be given no pencils or pens.

Two days later, in chambers, the trial judge, with defense counsel and counsel for the prosecution present, revisited the issue of courtroom security and addressed the circumstances of defendant's prior courtroom outburst. The court noted that jurors were not present when defendant " went ballistic," "went berserk, throwing water all over." The court observed that "two very large guards were necessary to restrain him notwithstanding that he was already shackled by his feet to an eye bolt on the floor." The judge then asked attorney Elmore whether he had overstated the incident with the use of the terms "ballistic" and "berserk."

Elmore responded that the judge had not overstated the severity of the incident, and added that "there were actually three guards" involved. Elmore indicated that the guards had to take defendant to the floor to subdue him and that defendant had knocked over the table where he was seated.

At that juncture, the trial judge criticized various justices of the appellate court for positions they had taken on the issue of shackling, stating that one of them had, in an appellate court opinion, "really roughed me up because I shackled some inmates." The judge expressed concern "that people with that frame of mind will speculate that I contributed to the event on Monday because I had Mr. Urdiales shackled." The court observed:

> "First of all, the response of defendant to go berserk was an overreaction on his part. If he didn't like that, he should have communicated to counsel. He should have said something in court. We did not have a word of protest coming from him prior to that. He simply went off."

The court characterized defendant as a "high risk individual." The trial judge observed that there had been a change in defendant's demeanor after he was convicted of the murders in Cook County and sentenced to death. The court stated: "Mr. Urdiales I have concluded fears that judgment day is coming closer." The judge noted "a dramatic change" at the prior pretrial hearing, when defendant "learned that this trial was actually going to go forward finally." The court continued, "I saw without a doubt an emotion in his eyes that I had not seen before. *** I saw furtive movements on the part of Mr. Urdiales; and I see quite frankly, honestly a desperate man." The trial judge then embarked upon yet another diatribe against what he saw as the appellate court's unwarranted intrusion into the security

concerns of the circuit court, expressing his belief that the appellate court seemed "bent on causing trial judges trouble." The judge indicated he would have a transcript of the proceedings sent to certain named justices of the appellate court.

Following that harangue, the judge again indicated that he did not believe the jury could see the shackling of defendant because of skirting around the table where defendant was seated. He asked defense counsel: "[D]o you want me to free up Mr. Urdiales more than I am contemplating doing?" In response, attorney Skelton asked only that defendant be given a writing implement short enough that it would pose no danger to counsel or anyone else. The court then stated: "DOC has had in the past inch pencils. *** It's a very small pencil. We'll explore that and come up with a writing material that couldn't do you harm." Still addressing the security issue, Skelton then stated:

> "Half facetiously, the only thing I want to make sure of is that Mr. Urdiales is seated on a very heavy chair. For the record, I had an unfortunate experience about 14, 16 years ago where an inmate from Pontiac Correctional Center decided that a better place for a chair was on my head than on the floor. I know what the court's talking about. I've been there."

Elmore thereafter sought to clarify what had prompted the defendant's courtroom outburst, noting that defendant "became upset not because he was shackled but because he could not communicate with his parents and Kendra Moses." Elmore explained that defendant had originally told a Livingston County correctional officer that Moses was an attorney, and Elmore subsequently told them otherwise, noting that she was a "mitigator," not an attorney. According to Elmore, defendant then turned and "glared at [Elmore] for a second," prompting Elmore to caution defendant, "Andrew, we're not going to do that now. She's not an attorney." Elmore said a correctional officer then politely informed defendant that he could not talk to Moses at that point in time. Elmore explained, "That's what precipitated him becoming upset. It wasn't even, in my mind, *** the fact he was shackled that's what caused him to go off. Just to support your position further, it wasn't the shackling I don't think that really upset him. It was the fact he couldn't communicate with Moses, and he went off."

A prosecutor interjected, "He was lucky he was shackled at that point or he would have had much more free rein." The same prosecutor added: "Mr. Elmore should tell you, but it's up to him, that he knows something with regard to a previous meeting in prison in a room with Mr. Urdiales that he later learned endangered his own self; but he'd have to tell you that. I bring it up. I guess he doesn't want to. It solidifies [the court's] intuition, and I know about it from several months ago." Although the judge indicated he would "ask the details," the matter was apparently dropped as the court and parties moved on to matters bearing upon jury selection.

Jury *voir dire* began on April 19, 2004. At the outset, the trial judge advised potential jurors:

> "You may or may not notice that Mr. Urdiales is in custody. And we have taken certain security measures because of that simple fact. You would expect us to do that for anyone who's in custody. The fact that Mr. Urdiales is presently in custody should not impact in any way whatsoever on the determination of whether Mr. Urdiales is found guilty or not guilty ***."

A total of eight jurors were selected for trial on the first day of selection. When jury selection resumed on the morning of April 22, defense counsel advised the court in chambers that defendant, "without any urging," had raised the possibility of entering an open plea of guilty to the murder charges against him. Attorney Skelton noted: "If *** Mr. Urdiales determines that he wants to plead guilty without–and we are talking a straight guilty plea–not trying to structure in a way of guilty but mentally ill plea, that would–and it is an understatement to say–substantially modify the manner in which we would approach potential jurors, the remaining four, plus alternates in this case."

The trial judge expressed concern over developments and stated the obvious: that defendant should take such an action only after "full deliberation." The judge encouraged counsel to consult with defendant further.

After another brief period of consultation with defendant, attorney Skelton reported that defendant was steadfast in his desire to plead guilty, however, it was likely that defendant would enter a plea of guilty but mentally ill. The defense contemplated "a waiver

of jury as to the first phase of the proceeding, plea of guilty, with the court determining the existence or lack of mental illness." The defendant would retain his right to a jury trial for the sentencing phase of the death penalty proceeding. A prosecutor advised the court and defense counsel that the State would dispute whether defendant was in fact "mentally ill," as that term is defined in the statute. Attorney Skelton, again speaking to procedure, reiterated that the court would decide whether defendant was mentally ill: "There would be a bench trial as to the existence or lack of mental illness. There would not be a trial before the Court as to the elements of the offense, that is that he killed Cassandra Corum." Counsel advised the court that a jury *would* be needed for the "second and third" stages of death penalty proceedings, the eligibility and aggravation/mitigation phases.

After further discussion and consultation, it was decided that the court would admonish defendant the next morning and conduct a hearing on defendant's plea of guilty but mentally ill (GBMI); however, the court would reserve ruling until jury selection was complete. Then the court would take additional evidence on mental illness, and either accept the plea of guilty but mentally ill or proceed with the jury trial.

On April 23, 2004, the defendant tendered his plea of guilty but mentally ill. The trial court admonished defendant thoroughly concerning the nature of the charge, the possible penalties, the three separate stages of a capital trial, and the variety of verdicts possible in the event the defendant retained his right to trial. The trial court explained that, by pleading guilty but mentally ill, the defendant would be giving up the defense of insanity, and a finding of guilty but mentally ill would not insulate him from a possible death sentence. The defendant indicated he understood the admonitions. The judge determined that defendant had not been subject to threats or coercion, and that his plea of guilty but mentally ill was voluntary.

The trial judge indicated he would not decide whether to accept the plea of guilty but mentally ill until there had been a full evidentiary hearing. The court explained the possible outcomes and ramifications of that proceeding, and defendant again indicated he understood. Defendant then signed and tendered a plea of guilty but mentally ill, which specified that he retained his right to jury trial on

-13-

all issues if the plea was rejected, and his right to a jury for sentencing if the plea was accepted.

The State then presented an extensive factual basis for the murder of Cassandra Corum. Defendant did not dispute the factual basis presented, and the court concluded that there was a sufficient factual basis "with respect to the murder elements themselves." The court again indicated that it would not accept the plea of guilty but mentally ill until there had been an evidentiary hearing on the issue of mental illness. Thereafter, jury selection resumed, with four additional jurors, and six alternates, chosen over the next several days.

After the completion of jury selection, defense counsel informed the court that, in the event the court rejected the plea of guilty but mentally ill, the defendant was considering waiving a jury for the guilt/innocence phase and requesting a bench trial to preserve his insanity defense. Noting that a jury had already been chosen and was waiting to hear the case, the trial judge expressed some reluctance to allow the jury waiver, as well as frustration with both the defense and the appellate court.

Nonetheless, on May 4, 2004, the parties and the trial court agreed to conduct two hearings simultaneously. Pursuant to the agreed mode of procedure, the trial court would consider whether there was sufficient evidence of mental illness to support defendant's plea of guilty but mentally ill, *i.e.*, whether defendant suffered from "a substantial disorder of thought, mood, or behavior" which afflicted him at the time of the offense and "impaired his judgment." See 720 ILCS 5/6–2(d) (West 2004). In the event the court ultimately rejected the GBMI plea, the judge would also consider whether defendant had established the defense of insanity. The defense stipulated that the prosecutor's previously recited factual basis was sufficient to establish the basic elements of the murder charge. Defendant was admonished regarding the proposed procedure, and consented to it, waiving his right to a jury trial on the guilt/innocence phase.

For purposes of the dual proceedings, the trial court admitted and considered several exhibits documenting psychiatric evaluations of the defendant, and also heard live testimony from expert witnesses. The defense called three witnesses: Drs. Terry Killian, James Merikangas, and Daniel Cuneo. The State called two witnesses: Drs. Janet Willer and Park Dietz. Written reports of Drs. Killian, Cuneo,

Merikangas, and Dietz were among the exhibits considered by the court, as were reports received from two nontestifying defense experts, Drs. Charles Opsahl and Dorothy Otnow Lewis.

Dr. Killian, a psychiatrist, believed defendant was legally sane, but mentally ill, at the time of Corum's murder. Killian diagnosed defendant as suffering from post traumatic stress disorder (PTSD), bipolar mood disorder, panic disorder with agoraphobia, obsessive compulsive disorder (OCD), dissociative disorder, Tourette's, personality disorder, and mild neurological impairment. Killian felt the most significant of these was dissociation, which is something like multiple personalities. Killian believed, in defendant's case, an "angry part" of him "takes some degree of control," though it "does not appear to be complete control as you would see in a full blown, multiple personality disorder." Dr. Killian believed defendant was not malingering because he did not volunteer symptoms as he could have. Killian acknowledged that defendant had read a book by Dr. Lewis, his expert for his unsuccessful insanity defense in Cook County, and could have feigned symptoms from that book.

At one point in his testimony, Killian specifically stated that defendant, in his opinion, "was afflicted by a substantial disorder of thought, mood, or behavior which impaired his judgment but not to the extent that he was unable to appreciate the wrongfulness of his behavior." Later, Killian was asked by defense counsel whether the term "mentally ill," as used in section 6–2(d) of the Criminal Code, was consistent with his understanding of that term, as used in his practice. At that time, he acknowledged:

> "Mentally ill is a pretty vague term in a clinical sense. Mentally ill is generally used in psychiatry to refer to a wide range of psychiatric disorders that impair people to mild extents, substantial extents, or impair them to the point where they are unable to function; so it's a very broad term without a very specific definition in clinical use."

Killian explained he could only "describe [defendant's] symptoms [as observed or described to him]," put those together in "an organized diagnostic formulation," and explain the "nature of the psychiatric disorders" and the reasons, and extent to which, defendant has them. He concluded, "[I]t is the fact finder's position to decide whether that meets the burden of the law."

-15-

Dr. Daniel Cuneo, a psychologist, also testified that defendant "had a substantial disorder of thought, mood, and behavior which impacted upon his judgment." Cuneo examined defendant in 2003 and 2004, and concluded that he suffered from PTSD, bipolar disorder, Tourette's, OCD, personality disorder, mild neurologic impairment, and a history of sexually transmitted diseases. Unlike Killian, who believed that dissociation was the most significant or substantial of defendant's mental maladies, Cuneo thought that PTSD was the most significant of defendant's disorders. Cuneo did believe that the defendant occasionally suffered from episodes of dissociation, which occurred during periods of extreme stress. In that regard, he noted defendant's use of the pronoun "we" and the names Eric, Andy, and Andrew to refer to aspects of his personality. Cuneo did not believe that defendant was malingering.

In his report, Cuneo concluded that defendant's mental illness "did not substantially impair his ability to appreciate the criminality of his conduct when he is alleged to have killed Cassie Corum. He could have controlled his behavior then and he knew that killing was wrong." However, Cuneo testified to his belief that defendant's "judgment was impaired throughout" due to escalating anger.

On cross-examination, Cuneo acknowledged that defendant's actions during the killings exhibited planning and preparation, and that defendant "was clever enough to have killed individuals and hid it for a period of time." Cuneo also conceded that it is possible for a person to be a "clever, mean, sexual, sadistic individual who likes to kill women," yet not suffer from a mental disorder.

The prosecutor asked Cuneo about defendant's "explosive anger," which Cuneo believed had resulted in impaired judgment and violence. In posing that question, the prosecutor first noted that defendant had initially become angry with Cassandra Corum at Wolf Lake, "his favorite murder dumping ground of women." The prosecutor next observed that defendant had restrained her there and then "drove a hundred miles from where he exploded in *** anger *** all the way to Pontiac, so he had a whole hour and a half of driving with her." In light of those circumstances, the prosecutor asked whether defendant's anger would have subsided by the time he got to Pontiac.

In response, Cuneo stated that defendant's debilitating anger would not have subsided until "the murder was done." He continued,

-16-

clarifying his position: "I don't believe, at any point, this individual was impaired to the extent that he was unable to think *** what I am saying is that it's an impairment of judgment ***."

Dr. Merikangas, a psychiatrist, opined that defendant had an organic brain disease, which rendered him insane at the time of the crime. Merikangas disagreed with Killian and Cuneo insofar as they diagnosed defendant with PTSD and dissociative personality disorder. Merikangas noted that scans of defendant's brain in 2002 showed atrophy, which might have resulted from improper treatment of syphilis. Tests also showed frontal lobe damage, lack of reflexive response, and decreased blood flow and metabolism in the right temporal lobe of defendant's brain. Dr. Merikangas believed episodes of loss of control and loss of reason were brought on by stress, such as sexual situations when defendant was belittled or there was a fight. Though Merikangas did not identify a source of stress, he reported that defendant had "a violent attack of rage at the Cook County jail" during Merikangas' interview with defendant.

Dr. Opsahl's report set forth a diagnosis of "significant neuropsychological impairment" and "paranoid psychosis in the presence of a cyclic mood disorder that includes elements of both hypomania and depression." The report did not address defendant's behavior at the time of the murder.

Dr. Lewis' report concluded that defendant was "flamboyantly psychotic at the time of the alleged offenses and was operating in response to delusions and command hallucinations." Lewis' report contained statements by defendant that he heard voices that gave him instructions from the CIA. She also reported references to "Andrew and Eric" as separate personalities.

Dr. Willer, a psychologist who worked for the Veterans Administration, saw defendant approximately 105 times between 1991 and 1996. She believed defendant suffered from mild depression and avoidant personalty disorder.

Dr. Dietz, a psychiatrist, testified, rendering his opinion that, at the time of Corum's murder, defendant had the capacity "to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law," and he did not fit within Illinois' statutory definition of guilty but mentally ill. Dietz concluded that defendant did not have a *substantial* disorder of thought, mood, or

behavior, as required by the statute. Dietz diagnosed defendant as suffering from Tourette's syndrome, a personality disorder with schizotypal traits, and sexual sadism. He believed it was defendant's anger, rather than a substantial mental disorder, that impaired defendant's judgment when he murdered Cassandra Corum. Dietz did not believe that defendant had PTSD, but even if he did, Dietz categorized PTSD as an anxiety disorder, not a mental illness; thus, it would not meet the definition of mental illness under Illinois law. He also rejected the possibility of organic brain damage because neurological tests, and a magnetic resonance imaging (MRI) scan in 2004, were within the normal range. In Dietz's opinion, defendant's use of the passive voice and plural pronouns when describing his actions while murdering his victims was nothing more than a linguistic device "to distance himself from responsibility for the offense."

Dietz believed that defendant's judgment was in fact impaired when he committed the murder, but not by a mental illness. In Dietz's opinion, "nearly everyone" who commits murder "has impaired judgment at the time, including this defendant." Dietz testified that anger was the "one clearly provable element that impaired [defendant's] judgment." However, Dietz identified two other "prime candidates" as "sexual desire" and "a kind of predatory desire for conquest." The latter observations were consistent with Dietz's diagnosis that defendant was a sexual sadist, which he defined as one who exhibits "an enduring pattern of sexual excitement or desire involving the infliction of pain or the humiliation of others."

Dietz based his diagnosis of sexual sadism primarily upon the account given by defendant's sole surviving victim, J.A. As Dietz noted, her description of defendant's behavior at the time he raped and tortured her is the only description of defendant's criminal actions that was not given by defendant. Dietz summarized J.A.'s account of her ordeal as follows:

> "[In] that incident he called her a bitch, held a knife to her throat, pulled her head into the dashboard, bound her hands behind her back, pulled her by the hair to force fellatio, cut off her shorts, underwear and bra, gagged her with her underwear and bra, called her a bitch, a whore, a slut, as he raped her vaginally, scripted her language, namely telling her exactly what to say. He directed her to say that she loved him.

-18-

Hit her, strangled her to the point of unconsciousness, and bit her neck drawing blood. That is a classic textbook description of the abducting and rape of a woman by a sexual sadist. Because he is demeaning her, controlling her, causing her pain while experiencing sexual excitement. Every feature of that is exactly what we expect to find in sexually sadistic types. And the significance of [J.A.'s] account is that she is the only living victim of rape and abduction that can tell us what defendant actually does with a victim. For every other case, that is the eight homicides, we only know what the corpse can tell us and what the defendant is willing to say."

Dietz acknowledged that a single incident is not sufficient to diagnose sexual sadism, so he supported his diagnosis with another reported incident–one that led to defendant's arrest–in which a prostitute described a 1997 encounter with defendant. Patricia Kelly reported that defendant had asked her to accompany him to the Wolf Lake area and allow him to handcuff her, duct tape her, tie her up, and have sex with her in the back of his truck. Dietz believed that request was also suggestive of sexual sadism. Dietz answered affirmatively when the prosecutor asked whether there were "some similarities concerning binding and gagging and binding and abusing the other victims even though they are not here to tell us." Finally, Dietz reported that *defendant* had acknowledged that there is a part of him "that enjoys torture, that would like to inflict as much damage as possible, that enjoys bondage and sadomasochistic activity, that wants to control."

At the conclusion of the evidentiary portion of the hearing, the circuit court indicated it would entertain arguments of counsel. Attorney Skelton then asked the court: "What standard is the Court applying concerning the existence of the factual basis for the existence of mental illness at the time of the offense?" An extended discussion ensued between the parties and the court concerning the appropriate standards and evidentiary burdens the court would apply, with the defense arguing that the court had no authority to weigh the evidence adduced on the issue of mental illness. At the conclusion of that discussion, the court stated its belief that cases pertaining to uncontested guilty pleas would not apply to defendant's plea of guilty but mentally ill, since the State, in this case, was contesting whether defendant was in fact mentally ill as defined in section 6–2(d) of the

Criminal Code. The court nonetheless commented that "the burden the defense has at this proceeding *** dealing with whether the court should accept or reject the plea of guilty but mentally ill is not a preponderance of the evidence. That would be the case at bench trial. It is less than that." However, the court still determined that it should "weigh" the evidence presented at the hearing, noting that defendant was not entitled to have the court "simply disregard the evidence presented by the State." Following arguments of the parties, the court indicated it would recess over the weekend to consider the evidence and arguments.

On the morning of May 10, 2004, the court announced its rulings in chambers in order to protect the defendant from media coverage and to ensure that the sentencing jury would not be tainted when it later heard evidence of mental illness. First, having weighed the evidence presented by the defense and the prosecution, the trial judge stated he was not satisfied that a factual basis existed to support defendant's plea of guilty but mentally ill, noting that "the evidence fails to establish by a preponderance of the evidence that the defendant was guilty but mentally ill at the time of the incident complained of." Moreover, the court ruled that defendant had not established, by a preponderance of the evidence, that he was insane at the time of Corum's murder. Finally, the court found the State had proven, beyond a reasonable doubt, that defendant was guilty of first degree murder as charged in the indictment.

In support of his ruling, the trial judge noted that the principal defense witnesses disagreed in their primary diagnoses. Cuneo believed that defendant suffered, primarily, from PTSD; Killian's principal diagnosis was dissociation; and Merikangas determined that defendant suffered from organic brain disease, disagreeing with Killian's and Cuneo's diagnoses of PTSD and dissociative personality disorder. Killian and Cuneo believed that defendant was legally sane, but mentally ill, as defined in section 6–2(d); Merikangas testified that defendant was insane, as defined in section 6–2(a).

The court also found that defendant's experts had failed to explain how defendant was able to function in society during his seven years in the Marine Corps, or employed as a security guard, while suffering from the diagnosed illnesses. The court found that defendant's actions during the offense were inconsistent with those

of a person overcome by anger. To the contrary, they demonstrated planning and organization. The court rejected the assessments of Merikangas and Killian that defendant's crimes were not characterized by planning and organization, noting that defendant brought a gun, a knife, duct tape, and handcuffs. The court concluded, "the defendant went prepared and in fact successfully carried out this murder as well as seven others." With respect to the defendant's psychiatric evaluations, the court observed that defendant had "learned some things" about evaluations in the course of his unsuccessful trial in Cook County. As Killian acknowledged in his testimony, defendant had read Lewis' book, titled "Guilty But Mentally Ill."

The trial judge found the testimony of Dr. Dietz "substantially more persuasive and more convincing than that of the defense experts." As noted, Dietz believed that defendant was not legally insane and he did not meet the statutory criterion for a finding of guilty but mentally ill. The court accepted Dietz's assessment that defendant is a sexual sadist and is "angry at the world and his unsuccessful circumstances in life." The court stated: "[T]o rule in favor of the defense, I would have to totally set aside the testimony of Dr. Park Dietz, which *** I find to be the most convincing and persuasive of the witnesses," and "even more importantly, to find in favor of the defense, I would have to disregard the facts of this case."

After announcing his ruling, and before convening in open court, the trial judge revisited the issue of courtroom security, noting that the jury would not see the shackling of defendant because of skirting around defendant's table, reiterating his earlier findings, and enunciating two additional factors. The court noted, since its original ruling regarding the physical restraint of defendant, the court had been apprised of the full extent and scope of defendant's homicidal activities in California, and had heard psychiatric testimony pertaining to defendant's explosive personality. With those additional comments, the court inquired of defense counsel:

> "THE COURT: So that is the record on shackling. I guess I should give the defense an opportunity to suggest that I do something differently. I would ask Mr. Skelton and Mr. Elmore, are you asking that I do something differently on shackling than I have decided to do?

MR. SKELTON: Given the totality of the circumstances and the discretion given the Court which I believe is an accurate assessment of the physical layout of the courtroom and the shackling devices and means by which our client is secured in the courtroom, I don't think it is an issue, Judge.

THE COURT: All right. Mr. Elmore.

MR. ELMORE: No, Judge. I think what you have done is appropriate under the circumstances."

The court then advanced the proceeding to the eligibility phase of sentencing. Defendant waived a jury for the purpose of determining whether he was eligible for the death penalty. Without objection, the State introduced defendant's birth certificate, showing him to be over 18 years of age, and certified copies of defendant's two murder convictions in Cook County. The trial court subsequently found that defendant was over the age of 18 when he murdered Cassandra Corum and he had been previously convicted of murdering two women in Cook County, thereby establishing his eligibility for a death sentence under section 9–1(b)(3) of the Criminal Code (720 ILCS 5/9–1(b)(3) (West 2004)).

At the beginning of the third phase of this capital proceeding, the trial court advised the jurors of developments in the first two phases–to which the court had referred during jury selection–explaining why jurors had not participated in earlier stages of the proceeding, and bringing the jurors current on findings made during the initial phases of the trial. The court read the jurors the statutory definition of insanity, and advised jurors that the court, pursuant to defendant's jury waivers, had determined (1) that the State had proven defendant guilty of Corum's murder beyond a reasonable doubt, (2) that defendant had not proven by a preponderance of the evidence that he was legally insane at the time of the offense, and (3) that defendant was eligible for the death penalty because he was over 18 years of age at the time of the offense and had been previously convicted of murdering two or more persons. The court noted that those findings were binding upon the jury, and informed the jury that its function would be to determine whether death was the appropriate sentence. With that, the parties gave their opening statements.

Early in defense counsel's statement to the jury, he acknowledged that the trial judge had rejected defendant's "plea of insanity," but he advised the jurors that they could "still consider the background of Mr. Urdiales *** to see whether or not, not that he is insane, but did he suffer from any mental illness or mental disease or mental defects. Did it reduce his ability to think and act? Did it reduce his ability to perform like a normal, healthy person?" Counsel told the jurors, "Those are facts that you must also consider."

Later, when describing the harsh conditions of incarceration, which he likened to life "in a cage," counsel again stated, "The evidence will show that while Andrew Urdiales is not insane, *** he suffers from mental illness or mental disease." Still later, counsel stated:

> "Mr. Urdiales, in fact, does suffer from defects of the brain. And so the question then becomes do we as a society treat someone who is mentally ill as opposed to someone who is mentally healthy the same. And we suggest not. We suggest that the most appropriate way is to punish by life in prison without the possibility of parole."

Counsel concluded his opening statement with yet another reference to defendant's mental illness. With the conclusion of opening statements, the State presented evidence in aggravation.

In aggravation, the State presented evidence of the eight murders committed by defendant, as well as J.A.'s testimony describing how defendant kidnapped, raped, and attempted to murder her. In the interests of brevity, we will substantially summarize that evidence, which is derived from police investigations of the crime scenes and from interviews with defendant. We note that defendant's description of events did not always agree with the physical evidence discovered at the crime scenes, as was the case with the murder of Cassandra Corum; however, to simplify the descriptions of the murders, we will generally recount defendant's version of events.

Defendant's first murder victim was Robbin Brandley, a California college student he killed in January of 1986. At that time, defendant was in the Marines and stationed at Camp Pendleton in California. Defendant told police he was upset about some friendships at the base, so he decided to rob someone. Defendant took a "big old hunting knife," approximately 11 inches long, and drove

to a college just north of Camp Pendleton. When he arrived, he took up a position in a poorly lit area and waited for someone to walk by. When defendant saw Brandley, he came up behind her, put his hand over her mouth, and told her he wanted her purse. She immediately complied; however, defendant just put the purse on the hood of her car and began stabbing her in the back. After she fell to the ground, defendant stabbed her several more times in the chest. Once, when defendant stabbed her in the ribs, the knife got stuck, and he had to step on her body in order to remove it. Defendant left Brandley in the parking lot to die, having stabbed her a total of 41 times in the back, hands, neck, and chest. Defendant told police that his victim "could have been anybody," and that Brandley "was just a random female."

After the murder, defendant had blood on his jeans, jacket, and hands. In order to conceal the blood, and get back on the base, defendant rubbed grease from his car's engine over his clothes to hide the blood. When he returned to the base, defendant told the military police that his car had broken down and he had to fix it. The police believed defendant's story, which made defendant think they were "dumb shits."

Defendant indicated he had the same knife with him when he later had sex with a prostitute in Hollywood. Defendant said, "[S]he was lucky."

In July of 1988, defendant committed his second murder, killing Julie McGhee in Cathedral City, California. Defendant picked up McGhee on a road frequented by prostitutes and drove her to a remote construction area, where they had sex. Afterwards, defendant got his gun and ordered McGhee out of the car. When she got out, he shot her in the head. Defendant noted he "really didn't feel anything" after killing McGhee. He said it was "just so quiet and peaceful" that he got in his car and drove to a bar where he "had some beers and watched the girls dance."

In September of 1988, defendant killed his third victim, Mary Ann Wells. Defendant picked up Wells, who was working as a prostitute, and drove her to an industrial area in San Diego, where they had sex. After he finished, defendant shot Wells, recovered the $40 he had paid her, dumped her body in an alley, and drove away.

Defendant murdered Tammy Erwin in Palm Springs in April of 1989. Defendant had had sex with Erwin on at least one occasion

-24-

prior to April 1989. On the night of the murder, defendant picked up Erwin and took her to a vacant lot, where she performed oral sex on him. Defendant did not remember arguing with Erwin, but he did recall shooting her while he was outside of his truck. After defendant shot Erwin, he got into his truck to leave, but noticed that Erwin was still standing up, clutching her head. Without getting out of his truck, defendant shot Erwin a second time, after which she fell to the ground. Defendant shot her a third time, before driving off.

Defendant was discharged from the Marines in 1991, and moved back to Chicago to live with his parents. In September of 1992, defendant returned to California for a short visit. During that visit, he kidnapped, raped, and attempted to murder J.A.

In his statement to police, defendant indicated he first saw J.A. at a bus stop and offered her a ride. En route to J.A.'s house-sitting job, defendant obtained a telephone number from J.A., which he subsequently determined was a "bum" number. The next morning, defendant waited for J.A. to get off work and offered her to take her out for breakfast. J.A. agreed, and got in the car.

Defendant later related he was "just feeling upset about the number or something," and "something was just kind of building up, you know, tension." After driving a short distance, defendant stopped the car, reached over and grabbed J.A. by the hair, and produced a gun. Defendant observed that J.A. became "pretty much submissive from that part forward." Defendant ordered J.A. to turn around, and he tied her hands behind her back. Defendant later told a police officer:

> "I think *** before we started moving after I tied her hands up, I reached over and I kissed her. I just put my lips on her mouth and then I just started, you know, I was trying to make out with her."

When defendant started driving again, J.A. told defendant she would do anything he wanted, so defendant unzipped his pants, pulled J.A.'s head down, and said "suck my dick" or "suck my cock." J.A. then performed oral sex on defendant until he tired of it and "picked her back up." In an interview with police, defendant remarked: "She kept asking me where we were going and she'll do anything I want. Shit like that, you know."

Defendant drove out into the desert, stopping at one point to cut J.A.'s panties and bra off. Defendant then rolled up J.A.'s panties and stuffed them in her mouth. Defendant eventually "tried to rape" J.A.. Defendant said she "tried to help" him, but "nothing happened" because he could not achieve an erection. After a while, defendant became angry and the "tension" began to build. Defendant said he began to choke J.A., "and she kept kicking and *** her saliva was coming out of her mouth and *** her face was turning blue and then red and it was just a battle *** for a while." Eventually, defendant's hand started to get tired and stiff, so he got off J.A. and sat down.

Thereafter, defendant got his gun and pulled J.A. out of the car. He forced her to her knees and again made her perform oral sex on him. Defendant eventually tired of that. Frustrated, he grabbed J.A., walked her to the back of the car, forced her into the trunk, and drove off. At some point during the drive, the lid of the trunk popped open and defendant stopped to slam it shut. Before defendant could get underway again, the trunk popped open a second time, J.A. jumped out, and she ran away screaming. Defendant later told detectives his first thought was to shoot her, but he decided against it because there were several cars nearby. Defendant got into his car and drove away. He told the police: "So that was the last time I saw her. I don't know if somebody else picked her up and finished where I started."

J.A., defendant's sole surviving victim, testified at the defendant's sentencing hearing. Because J.A.'s testimony provides unique insight into defendant's activities with one of his victims, and the perspective of that victim, we discuss J.A.'s testimony at length.

J.A. said she accepted a ride with defendant on the evening of September 27, 1992, because she would otherwise have been late for work. Defendant repeatedly asked her for her phone number, so she eventually gave him a fake number. He then dropped her off at work.

The next morning, as J.A. left work, defendant drove up behind her and asked her if she wanted to get some breakfast. J.A. recalled that defendant "looked friendly again, just kind of smiling like. I wasn't scared of him." So, J.A. got into defendant's car.

Defendant soon confronted J.A. about the fake phone number. When she denied giving him the wrong number, defendant became angry. He pulled the car to the side of the road and produced a knife and twine. J.A. said, before she "even [had] time to think to jump out

-26-

of the car," defendant had the knife to her throat. He pushed her head into the dashboard, calling her a "whore, a bitch, and kinds of crazy things." He then grabbed her arms behind her back and tied them together with the twine. Defendant hit J.A. and displayed a gun. J.A. testified she felt "totally helpless." She recalled, "I was in his control totally; and I even told him, I let him know that I was." As defendant started to drive again, he grabbed J.A.'s head and forced her to perform oral sex on him.

Defendant drove into the desert and stopped the car. J.A. testified that she feared defendant would become even more aggressive if she attempted to resist him, so she said, "[I]f you are going to rape me, rape me. But please don't kill me ***." Defendant did not respond. He proceeded to pull off her shorts and shoes, hitting her in the head with one of her shoes. Defendant then cut off J.A.'s panties with his knife and shoved them into her mouth, causing her to vomit and gag. After that, defendant cut off J.A.'s bra and tied it tightly around her mouth.

J.A. testified that defendant then raped her, an ordeal that she described in graphic detail:

> "And then he spread my legs open, and then he had sex with me. And then he was hitting on me and just staring at me; and then he was calling me a bitch, a whore, a slut, and I was just crying. *** Then he told me to tell him that I loved him. *** I thought it was kind of stupid because I had underwear shoved down my throat and a bra tied around my mouth; and I was thinking, how *** am I going to say anything ***? I'm gagged. So I just looked into his eyes; and he was saying, say it, bitch, say it. And I just looked into his eyes; and I tried to say like, hello, I can't say anything. I've got stuff in my mouth. And when I tried to talk, I would just gag. *** I think he finally realized that I couldn't talk with the underwear down my throat so he took it off. And he said, say it, bitch."

When J.A. said it, it—not surprisingly—sounded insincere. She observed, "It sounded like I was saying it so I wouldn't die." Defendant said, "You are lying," and struck J.A. again. He repeatedly urged her: "[S]ay it. Say it. Tell me you love me like you mean it."

When J.A. was unable to do so in a satisfactory manner, defendant started strangling her with his hands. J.A. testified:

"He just grabbed me by the throat and started strangling me until my eyes started rolling back in my head; and then he was yelling at me, calling me a bitch, a slut, a whore. And this whole time I was just so confused, thinking, oh my God, I'm going to die. *** I thought about everybody, and I was wishing some way they could know what my final thoughts were before I died because there was no way, there was no way nobody was going to know anything; and that was the scariest part was that something like this could happen when people are just driving around and going about their day; and I'm in the desert about to be murdered."

J.A. either lost consciousness momentarily or went into shock. She testified she could not feel anything for a while. During that period, which she described as "really peaceful," she thought she had died, and she felt "happy." However, that momentary respite passed, and J.A. soon realized that defendant was still choking her, "whipping [her] back and forth trying to get [her] back to it." She related, "And then all of a sudden I just came back to it, and I could feel everything again."

J.A. testified that defendant then began fondling her breasts and "sucking" on her neck. Simultaneously, she felt something cold running down her neck. When defendant stopped, he put his face in front of hers. It was then that she noticed defendant had blood on his teeth, and J.A. started to panic again. She recounted: "I knew he tried to bite me; but I couldn't feel it because I was in such bad shock some of the things I didn't even feel. But then he opened the door."

Defendant exited the car with his gun, and pulled J.A. out of the car by her hair. With his pants down, defendant ordered J.A. to "suck it, bitch." J.A. initially refused. She recalled: "I just wanted to die so I said no. And I was hoping that he would just shoot me because I couldn't take it anymore, and I wanted to go back to that state I was in a little while ago." Defendant again ordered J.A. to "suck it," and he hit her in the head for emphasis. J.A. resolved to "suck it" and "bite it off." However, immediately after she began, defendant "nailed [her] in the head again." She recalled, "[H]e got really upset because it wasn't erect to suck it. It was never erect the whole time, and I think that makes him really mad."

Defendant then left J.A. for a moment, removing a bag, with "knife blades sticking of it," from the trunk of the car, and placing it

in the backseat. J.A. seized the opportunity and tried to escape. She testified: "I started running through the field as fast as I could; and I could see nothing. I could see no roads. I could see nothing; and I knew I was doomed; but if I'm going to die, I want to at least *** have someone say that I tried to run." Defendant eventually caught J.A. by the hair, "ripped it back," and she fell to the ground. Defendant began to drag the partially naked J.A. through cacti and back to the car.

When he got J.A. back to the car, defendant decided to put her in the trunk. J.A. stated, "I just wanted him to kill me; and he decided not to kill me right then." Defendant tried to force J.A. into the trunk, and she resisted. She recalled: "I thought if I go into this trunk *** I am going to be dead. But he kept prolonging it and prolonging it; and it was driving me mentally insane."

Defendant was eventually able to force J.A. into the trunk. J.A., who was tied with twine and clad only in a sweatshirt, thought "about being chopped up." She thought she would be taken somewhere and would be "hacked up in pieces." She tried to kill herself by holding her breath and by bashing her head against the inside of the trunk. She recalled, "I didn't want him to kill me. I wanted to kill myself."

When J.A. was unsuccessful in that attempt, she suffered through periods of panic, and eventually experienced a loss of energy, "like *** having a seizure." J.A. said she then started to pray. After praying, she got "really, really calm." J.A. testified: "I just got all of my energy together; and then I just stretched my arms hardly; and all of the twine just busted right off my hands."

Having freed herself, J.A. again succumbed to panic and despair. She testified:

> "And I kept saying, now what, God? *** I'm in a frickin' trunk. How am I going to get out of this? And so I just lost hope again; and I got the twine; and I wound it up; and I put it around my neck; and I squeezed it really tight; and I was trying to choke myself. *** I couldn't strangle myself. And I couldn't think of any other way to kill myself."

J.A. briefly entertained the idea of fighting defendant when he opened the trunk, but she quickly decided against it, concluding, "He'll pull me out. We'll struggle. One of us will die. Probably me

since I have no weapons." So, J.A. resolved to try and escape from the trunk.

J.A. eventually found the latch of the trunk. She recalled she "pushed something, pulled something, turned something, and it went click." She lifted the trunk a little bit and there was "light everywhere." J.A.'s state of mind was such that she initially contemplated whether to "jump out and get run over and die," which she "really didn't mind" at that point, or to actually try to save herself. She decided on the latter course, and raised the trunk lid in such a way as to draw defendant's attention.

Defendant quickly pulled over, and shortly thereafter appeared at the rear of the car with his gun. Defendant slammed the trunk lid closed and yelled, "Don't open that trunk, bitch. I'll shoot out the back seat." He then got back in the car, but was unable to drive away because the car had become stuck in the soft sand.

Defendant kept trying to move the car while he intermittently threatened to kill J.A. if she tried to open the trunk again. J.A. eventually unlatched the trunk a second time, jumped out, and ran. As she did so, she looked back and saw defendant in pursuit with a machete. As she ran, J.A. tried to get motorists to stop, but they would just drive by. Finally, she saw a truck coming. J.A. recounted: "So I just ran in front of it with my eyes closed because I thought he was real near to me so I wanted to be run over before I was hit with that [machete]." The occupants of the truck, two Marines, grabbed J.A. and put her in their truck. When she told them what had happened, they initially began chasing defendant, until she told them he was heavily armed, at which point they desisted. The two Marines took J.A. to a nearby gas station; the police were called; and J.A. was thereafter taken to hospital.

Under cross-examination, J.A. acknowledged that she still has the experience "following [her] around" and that she is now "different mentally."

Three years after he kidnapped, raped, and attempted to kill J.A., defendant murdered Denise Maney in Palm Springs. During a vacation to California in March of 1995, defendant picked up Maney in the same area where he had earlier picked up McGhee and Erwin. Defendant drove Maney to the desert, and stopped the car on a deserted side road, where he ordered Maney to strip and perform oral

-30-

sex on him. Defendant said he got "tired" of that after a while, so he grabbed Maney by the hair, walked her over to the front of the car, and told her to lie face down on the ground. Defendant got on top of her and tied her hands behind her back. He again directed her to perform fellatio. However, defendant said, he "wasn't really feeling satisfied," so he turned Maney over on her knees and "shoved" one of his fingers into Maney's anus. Maney screamed. Defendant recalled, "And then after awhile I drove in two fingers. I just kept going–shoving my fingers in her ass. *** And that went on for a while. I just kept doing that to her." Defendant said, when he got tired of that, he picked her up and walked her toward the desert. When she turned around, defendant put his gun in her mouth. "And then it went off." The gunshot blew off the back of Maney's head.

Defendant stated: "Then she fell and she was still like gurgling *** making a lot of noises. But I had some blood on me a little bit and the gun[,] so I just walked away." Defendant got in his car, and started to drive away, but he eventually stopped. Defendant stated: "I didn't feel nothing *** I didn't really think. I just kind of like wiped–cleaned my hand off a little bit and I stopped, turned around and I went back to her." Defendant then described his mood as "angry" and "very upset." He said, this time, he took his knife out.

In relating what he did next, defendant slipped back and forth between use of the singular pronoun "I" and the plural pronoun "we." He told the police:

> "[W]e took the knife out and we went back toward the–back to her where she was lying at we just started stabbing for some reason. Just on the body several times, in the chest maybe, stomach. *** I remember I made a slashing motion by the throat. *** Then we went back to the car. And I–we, we–picked up her clothes. *** Then we were driving, we just started driving ***."

Defendant said *he* threw most of Maney's belongings on the side of the road. However, he said, alternately: "We just *** I just" buried "her panties and her little lingerie stuff."

Defendant murdered a sixth woman, Laura Uylaki, in April of 1996. Defendant told police he met Uylaki in the winter of 1995-96, and they went out a few times. He and Uylaki had sex twice at Wolf Lake in a sleeping bag defendant kept in the back of his truck. In

April of 1996, defendant again picked up Uylaki and they drove to Wolf Lake. On the way, they began to argue. According to defendant, when they arrived at Wolf Lake, defendant took his loaded .38-caliber revolver from underneath the driver's seat and was "showing it to Laura," when the gun went off, shooting a hole in the roof of the truck. Defendant stated, after his gun went off, "Laura got mad and all hell broke loose."

Defendant claimed that Uylaki grabbed for his gun, breaking his left index finger in the process. He said she then jumped out of the truck and began to run. Defendant stated that he followed her and fired "a couple more times" in her direction. She fell to the ground. When he determined that she was dead, he decided to throw her body into the lake. According to defendant's version of events, he *then* took off her clothes, carried her body to the lake, and pushed her in. Thereafter, defendant said he drove back to Chicago, and on the way, he threw Uylaki's clothes from the passenger side of his truck.

Defendant told police he met Lynn Huber, his seventh murder victim, in the summer of 1996, when she was working as a prostitute in Chicago. Defendant said they had sex a couple of times that summer. One evening in late July or early August of 1996, defendant saw Huber carrying a large garbage bag full of clothes. He stopped and offered her a ride, which she accepted. According to defendant, he pulled into an alley to have sex with Huber, but she started arguing with him and "acting kind of ditzy." Defendant said that Huber tried to get out of the truck, but he grabbed her and shot her in the head, using the loaded gun he kept under his seat.

Defendant stated he then put Huber's body in the bed of the truck and drove to Wolf Lake. In defendant's version of events, he *then* removed Huber's clothing and, in the process, pricked his finger with a needle. Defendant claimed that made him angry enough that he took out a knife, stabbed her "a lot of times" in the back, and shot her again. Defendant dragged her body to the lake and threw her in. Defendant later disposed of the clothes Huber had been wearing and gave her bag of clothes to the Salvation Army. Defendant observed, "[S]he won't need them anymore."

Defendant told police he killed his eighth and final murder victim, Cassandra Corum, on the night of July 13, 1996. Defendant said he had known Corum for about two years prior to the murder. On the night of the murder, defendant met Corum in a Hammond,

-32-

Indiana, bar and the two drove to Wolf Lake, where they had sex. According to defendant, Corum said something that made him angry–though he could not remember what–so he hit her in the face several times with his fist and open hand. Defendant stated that Corum started to become afraid and panicked, "so she began to fight *** back." Defendant said it was at that point that he forced Corum's hands behind her back and handcuffed her. He also claimed he then removed her clothing. Defendant told police that Corum "seemed numb with anxiety and fear. So she became passive and submissive." Defendant then bound her feet together with duct tape, put duct tape over her mouth, and positioned her so that her head was in his lap.

Defendant said he was "still pissed off" so he began driving south, down Interstate 55. He recalled he had driven "for a couple hours or so" when he started getting tired. At that point, he pulled off the interstate and continued driving until he went over a bridge that crossed a river. He then drove into a little park and shut off his truck. Defendant claimed he removed the duct tape and handcuffs from Corum–though that assertion is inconsistent with the state in which her body was found. Defendant said he and the still-naked Corum exited the truck. Defendant had gotten his gun from beneath the driver's seat of his truck. Defendant stated that Corum had walked to the back of the truck, and had turned to face him, as if to say something, when he pointed the gun at her and fired once. She fell to the ground. Because he was still mad at her for fighting and biting him, he then got his knife out of the truck and stabbed her "a few times."

Thereafter, defendant picked up her body, carried it to the bridge, and dumped the body into the river. He observed that he "didn't feel anything for Cassie *** she was just a whore." He added that he was "trained to kill in the Marine Corps." Defendant said he drove back towards home, throwing Corum's clothes out the window on the way. He noted they were "just garbage *** and there was no sense in keeping them."

As noted, much of the foregoing evidence comes from defendant's own statements to police. At sentencing, Detective Don McGrath of the Chicago police department testified that he escorted defendant back to the lock-up after the interviews. McGrath testified, when they got to the lock-up door, defendant looked at McGrath and

said: "Well, you know, I'm kind of glad in a way that you caught me. *** I was starting to get the urge again."

When the State had finished presenting aggravating evidence of defendant's criminal activity, the parties and the court discussed the commencement of the defense case in mitigation. In that regard, defense counsel stated his intention of introducing the psychiatrists' reports into evidence and asking that the reports go back to the jury. The State objected to the reports going back to the jury, arguing that the experts should testify in person and "be subject to cross-examination." The court expressed concern, noting that the reports in question were "extremely voluminous" and that Dr. Killian's report alone was 75 pages long. The trial judge advised the parties:

> "I'm not limiting either the direct or cross-examination of a particular expert. So you want to have an expert on the stand for two days, that's fine with me. You can go over his entire report if you like. *** [I]f all those questions are then asked of a witness, then the opposite side knows what to cross on. *** So the only point I'm making is that there is an unlimited opportunity to inquire of these experts."

The trial court subsequently ruled that the reports would not be sent back to the jury, noting, *inter alia*, "that's why we have the experts testifying because we are in a realm beyond the normal knowledge of the jurors."

With that, the defense commenced its case in mitigation. In mitigation, the defendant called Drs. Merikangas and Killian, Kendra Moses, a mitigation expert, Roger Cowan, former warden of Menard Correctional Center, and Steven Hardy, a clinical psychologist.

Kendra Moses, a defense mitigation specialist, testified regarding negative and positive experiences in defendant's life and the impact of defendant's conduct on his family. Moses observed that defendant was the youngest of six children. The Urdiales family was "fairly close" prior to defendant's arrest for the Cook County murders; however, that is no longer the case. As of the time of trial, the only family members who regularly visited defendant in prison were his parents, his sister, Cynthia, and her son. All of the siblings and grandchildren, except for Cynthia and her son, stopped visiting defendant's parents once they learned of the Cook County murders.

Moses noted that defendant's oldest brother, Alfred, was killed in Vietnam when defendant was three or four years old. Defendant was "very close" to Alfred. According to family members, defendant would sit on the porch and wait for his brother to come home, not understanding that his brother had died.

Alfred's death impacted defendant in another sense as well. After Alfred was killed, defendant's mother suffered through an "extended period" of depression for "two or three years." She had "trouble continuing to function in her everyday life." Moses testified it was during that period of time that defendant's older sisters, Cynthia and Monica, became his primary caretakers.

Moses suggested it was "in that environment that Monica eventually started to sexually abuse" defendant, though it would appear that the abuse–reported by defendant to have taken place when he was 11 years old and Monica was 13 or 14–would have taken place approximately four years *after* defendant's mother's period of depression. In any event, defendant told his psychologist and Moses that Monica had sexually abused him on several occasions and the abuse caused him intense feelings of fear and helplessness.

Moses further testified that defendant was subjected to bullying, beatings, and harassment from third grade through eighth grade. She explained that the Urdiales family–of Mexican origin–moved to Burnham, Illinois, when defendant was in third grade. They were the only family of Hispanic heritage living in the area. That ethnic difference, as well as defendant's small size and the developing symptoms of Tourette's syndrome, led to neighborhood children harassing, chasing and physically attacking him on his way home from school. In one instance, the police were called. The harassment was so bad that the family moved back to Chicago when defendant was in high school.

Defendant's parents believed that defendant's experiences growing up in Burnham made him "very anxious socially." He did not develop friendships easily and in fact "had at various times maybe one friend that he would play with or hang out with." As he got older, defendant was "fearful" around girls and did not date.

When defendant graduated from high school, he enlisted in the Marines, serving from 1984 until he was honorably discharged in 1991. Moses described defendant's experience in the military as "not

a failed career," but certainly "not the success he hoped it would be." Moses indicated that defendant did not make friends in the Marines and he had some unspecified difficulties.

When defendant was discharged from the Marines, he moved back to Chicago, where he lived with his parents. He is the godfather of Cynthia's son, Brian, and the two were described as "very close." Moses testified that defendant had a close relationship with all of his nieces and nephews.

Finally, Moses testified that defendant did seek counseling through the Veteran's Administration after his discharge from the Marines. He was referred to psychologist Janet Willer. He advised Dr. Willer that he needed help dealing with his temper and an inferiority complex. He also spoke to Willer about childhood harassment, sexual abuse, inability to relate to women, and the death of his older brother. Defendant attended over 100 sessions with Willer between 1991 and 1995. According to Moses, defendant stopped attending sessions when the Veteran's Administration changed its billing practices and he "didn't feel like he could afford the copayment."

The defense's next witness was Roger Cowan, former warden of Menard Correctional Center. Defendant was incarcerated at Menard at the time of trial. Cowan explained that an inmate who serves a life sentence without the possibility of parole would always be housed in a maximum security facility; an inmate on death row would be segregated from the general population. Cowan described in detail the tight security and highly restrictive conditions that apply to an inmate serving a natural life sentence. Cowan characterized incarceration at Menard as "a very rigid lifestyle *** very demanding on the inmates *** a tough life." He noted that Menard is not air-conditioned. Inmates can receive five visits per month, and they get five hours of recreation each week.

Cowan noted that defendant had spent seven years in the correctional system. He had been ticketed only twice: once for throwing his lunch tray from his cell onto the floor; once for failing to enter his cell on time. Cowan offered his assessment that defendant had made a "very good adjustment" to prison life.

Dr. Stephen Hardy, a clinical psychologist who had worked several years for both the Department of Corrections and the

Department of Mental Health/Human Services, testified that he had evaluated defendant on six occasions and had reviewed records pertinent to defendant's mental condition. Hardy diagnosed defendant with Tourette's disorder, post-traumatic stress disorder, obsessive-compulsive disorder, bipolar disorder, and personality disorder with avoidant and borderline features. Hardy based the PTSD diagnosis on defendant's "history of severe sexual and physical abuse involving an older sister and neighborhood bullies respectively." Hardy explained that a PTSD diagnosis based on childhood sexual abuse does not necessarily have to entail "an event where the person was threatened or suffered serious injury. *** Sexually traumatic events may include developmentally inappropriate sexual experiences without threatened or actual violence or injury."

Concerning the abduction and murder of Cassandra Corum, Hardy concluded that defendant acted while "under the influence of an extreme mental or emotional disturbance but not such to constitute a defense to the prosecution." Hardy noted in defendant's history a "clear pattern" involving "chronic feelings of emptiness and inappropriate anger and difficulty controlling this anger."

Hardy recognized that defendant "had some difficulties getting along with people, and there were some personal conflicts at work." Defendant consistently displayed an unwillingness to be involved with other people, particularly adult females. Notwithstanding defendant's "difficulties getting along with people," Hardy testified that defendant's potential for acting out violently in prison was low, an assessment he based upon the structure of prison and the prison authorities' ability to quickly intervene should defendant become violent. In that respect, Hardy concluded: "Looking at the circumstances under which he acted out violently in the past, examining the means he had to do so, the characteristics of his past victims, and you combine that with his behavior the past seven years in two maximum security environments, I think the potential for him to act out violently it's my opinion is very low."

Hardy acknowledged that defendant would still come into contact with women in prison. He also described an incident during which defendant became very loud and threw some papers while Hardy was interviewing him. Although Hardy did not call the guards, Hardy was nonetheless "concerned about it."

Dr. James Merikangas reiterated much of his testimony from the bench trial/GBMI hearing. Commenting on the MRI and the single photon emission computed tomography (SPECT) scan evidence, which suggested shrinkage of defendant's brain, Merikangas observed that such findings were often associated with dementia, loss of intellectual capacity, and abnormalities of motor control. Merikangas did not believe that defendant's criminal conduct could be explained simply in terms of inability to control his anger. Merikangas concluded: "I would call it rage attacks, I would call it impulse disorder, intermittent explosive disorder. I wouldn't simply call it anger." Merikangas stated his belief that antiseizure medication could prevent defendant's violent outbursts and antipsychotic medication could be used to treat "the disorder of thinking that he has."

Under cross-examination, Merikangas maintained that defendant's brain "shrinkage" and, inferentially, his "reduced mental capacity[,] *** probably did have something to do with the murders." Merikangas rejected the prosecutor's suggestion that defendant's actions during the murders showed he had no "coordination problems," and that he had displayed an "ability to plan," and select as victims women whom he could manipulate, control, and ultimately kill. Merikangas insisted that defendant's actions showed "an inability to communicate with women in a normal manner." When the prosecutor stated that defendant "never had enough guts to do it to a man, *** he always had to pick out a woman," Merikangas brought up "the outburst that he had here in the courtroom, when the jury wasn't present, where he turned over the table and went wild with even these guards standing next to him." Merikangas pointed to that incident as an indication that defendant suffers from a "real loss of control." Inquiring further about defendant's *spontaneous* loss of control, his impulse disorder, and his intermittent explosive disorder, the following colloquy ensued between the prosecutor and Merikangas:

> "PROSECUTOR: You think carrying around knives and a machete in a rental car in California when he picked up [J.A.], you think that showed a disorder of thought or did it show planning?

MERIKANGAS: That shows that he was looking for something but also indicates a certain paranoia to be carrying all those weapons."

The final defense witness was Dr. Terry Killian. Killian testified consistently with his testimony from the bench trial/GBMI hearing, focusing again on the defendant's mental state and dissociation at the time of Corum's murder. Killian emphasized, however, that the defendant accepted responsibility for his conduct and did not blame it on an alter ego. Killian also believed that defendant's voluntary counseling sessions with Dr. Willer represented "a good-faith effort" to obtain treatment "within the limitations of what I believe he is capable of doing."

Killian's testimony about defendant's diagnosis, background, family history, childhood trauma, and history of mental health treatment was also consistent with his testimony from the bench trial/GBMI hearing. Killian noted that he had reviewed medical records, arrest reports, and police records, and had conducted over 22 hours of interviews. Summarizing his findings, Killian explained that defendant was not insane and was responsible for his actions; however, Killian concluded that defendant suffered from extreme mental and emotional disturbances that reduced his mental capacity at the time of his offenses. Killian believed that defendant felt some remorse for his actions, but, even though it would have been to his advantage to express remorse in death penalty proceedings, defendant feared that expressing remorse would be perceived as self-serving and insincere.

On cross-examination, Killian testified that he had "reviewed" a sentence-completion test administered by Dr. Opsahl when forming his opinion. When the prosecutor handed Killian the sentence-completion test, and asked if that was the test he had reviewed, defense counsel objected, arguing that the test was not relevant unless Killian had relied upon the test in formulating his opinion. The prosecutor was then allowed to question Killian as to whether he had *relied on* the report when forming his opinion. Killian responded:

"A. I looked at this, but I didn't include this, I'm pretty sure I did not include a description of this in my report. I read through it and didn't see anything that, that was significantly different from what I already knew about him; so I didn't include the specifics of it.

Q. Did you rely upon, at all, in any respect, rely upon, for your opinions here and your assessment of Mr. Urdiales's personality, did you rely upon any of his answers here?

A. I don't think I did. I don't think I put much into the sentence completion test. I remember looking at it but not making much of it and setting it aside, and I don't think I relied on that. I relied on lots of other things but not that test specifically.

\*\*\*

Q. So you don't recall if some of the answers that he gave on this two-page test helped you formulate that he had this rage towards women?

A. I don't specifically recall. I'd be happy to look at it if you'd like."

After looking at the report, Killian stated:

"Well, they're consistent with what I already believed about him from everything else I had read. In other words, he does make comments in here about women that are pretty negative. That should hardly be surprising given everything else about him."

When the prosecutor asked for specifics, defense counsel objected and asked to approach the bench. The court announced a brief recess and made the following comments out of the presence of the jury:

"To cut to the core, the witness is not being responsive, and the right question I don't believe has been answered. The witness has testified very clearly to the tune of $36,000 that he has gone over with great care all of the materials of a psychiatric nature. The witness has acknowledged that this is among the materials. Now, what the witness has said here, is he has not included it in his report because it is consistent with what he already knew. He has not yet testified that he disregarded it and did not rely on it, but yet he has skirted the issue and not testified that he discarded it and didn't take it into account in arriving at his decisions. I think we need a vigorous interrogation on foundation by the State to see where this witness goes because he's going in both directions."

In subsequent foundational questioning, out of the presence of the jury, Killian conceded that he had taken into account all the materials placed before him, and then qualified his answer by adding, "[I]t's not accurate to say that each piece of paper received the same amount of attention as any other piece of paper." The prosecutor then asked if defendant's answers in the sentence-completion test were important in his analysis of defendant. Killian responded: "I'm answering this as well as I can."

At that point the court asked Killian if he understood the question, and directed him to answer it if he understood. The court advised Killian, if he did not understand, he should say so. At the court's direction, the prosecutor's question was read back, and Killian responded that he considered defendant's answers in the sentence-completion test "somewhat important." The prosecutor then returned to the critical question: "Did you take his answers to these questions into account in arriving at your conclusion?" Killian answered: "Not specifically, I did not include them in my report." As the prosecutor began to protest, the court again interceded:

> "All right. Once again, let me stop you here. Sir, there was a question asked you and you answered a different question. I'm going to have the court reporter read back the question once again. *** I want you to listen to the question that's asked of you and then I want you to answer that question unless you don't understand it. Do we understand each other?"

Killian answered affirmatively. When the question was read back by the court reporter, Killian finally answered, unequivocally: "Yes, I took them into account." With that, the court determined there was a sufficient foundation to go into the report before the jury. Before the jury was called back into the courtroom, the court asked attorney Elmore if there was anything he wanted to contest in terms of that ruling. Defense counsel responded: "It's proper, I agree. He took it into account; so, it's fair game."

Before the jury, Killian again acknowledged that defendant's answers in the sentence-completion test were considered in his assessment of defendant, and defendant's answers were consistent with defendant's attitudes toward, and feelings about, women. Although, at trial, the prosecutor then read aloud the open-ended portions of the sentences in the test, and Killian responded by

-41-

supplying the words defendant used to complete the sentences, we set forth here the completed sentences, utilizing hyphens to separate the test portions from defendant's responses:

"Sentence # 2: A wife should–be a good provider.

Sentence # 4: A man feels good when–he comes.

Sentence # 7: Men are lucky because–we have cocks.

Sentence # 8: I just can't stand people who–get in my face.

Sentence # 11: A woman feels good when–we stick it in them.

Sentence # 12: My main problem is–people.

Sentence # 13: A husband has the right to–beat his wife.

Sentence # 14: A woman should always–please her man.

Sentence # 19: If I can't get what I want–I take it.

Sentence # 22: My conscience bothers me–if I let it.

Sentence # 23: A man should always–be right.

Sentence # 25: When I am criticized–I get mad.

Sentence # 27: Being with other people–sucks.

Sentence # 30: What gets me into trouble is–sex.

Sentence # 35: A woman has a right to–be silent."

After going through the foregoing portions of the sentence-completion test, the prosecutor asked: "Hates women, doesn't he?" Killian agreed, adding that defendant had "a great deal of anger, and most of that anger is directed at women."

The prosecutor followed up by asking about the sexual abuse that defendant reported involving his sister, Monica. Killian acknowledged, on page 73 of his report, he wrote: "There were apparently only a few incidents of sexual activity between them, and Andrew told me that he did not experience the sexual contact with Monica as traumatic and he did not even think of it as being wrong until he was well into his adult years." Killian, however, disagreed with the prosecutor's assertion that there "wasn't any sexual trauma," suggesting that "it was more traumatic than he currently admits to for whatever reasons." At the conclusion of Killian's testimony, outside the presence of the jury, the court ruled that the sentence-completion test would be included in the record, but would not go to the jury.

After Killian's testimony, the defense rested. Defendant elected not to testify in his own behalf or deliver a statement in allocution.

In rebuttal, the State called Dr. Park Dietz, who testified consistently with his testimony at the bench trial/GBMI hearing. Prior to the defense's stipulation that Dietz was qualified as an expert "in the area of forensic psychiatry," the State elicited testimony that Dietz had been previously involved in examinations of various high-profile individuals such as John Hinckley, Jeffery Dahmer, and Ted Kaczynski, also known as the Unibomber. After the defense stipulation, Dietz testified to his finding that defendant shows clear signs of a personality disorder with antisocial and schizotypal features. Dietz defined a personality disorder as "a lifelong pattern of maladaptive behavior" that "tends to cause impairment" in a person's "relationships with other people."

Dietz believed that three factors may have played a part–to a greater or lesser extent–in defendant's development of a personality disorder. First and foremost, Dietz felt that the taunting and bullying defendant experienced as a child was a significant factor. Dietz noted that defendant had been "taunted and bullied and teased" as a child, and he "blamed his crimes to some extent o[n] what people had done to him as a kid because it made him so angry and resentful." Second, Dietz believed that the death of defendant's brother may have contributed to the development of his disorder. Although defendant did not remember his brother, and he did not feel impacted by his brother's death directly, there was evidence that defendant's mother became withdrawn after Alfred's death, and was "no longer as attentive and participatory as a caretaker." Finally, Dietz mentioned the defendant's report of sexual intercourse with his sister as a possible factor; however, Dietz noted that defendant was not "particularly pleased or upset by it. He did not regard this as a very important aspect of what had happened to him as a child." Dietz did not believe it was "a particular[ly] traumatic event" for defendant. He placed more importance on the "unavailability" of defendant's mother after his brother's death.

Dietz believed that anger played an important part in all of the crimes committed by defendant, and in his work-related problems as well. Dietz also testified that hatred of women and sexual sadism were significant factors in the commission of defendant's crimes.

Under cross-examination, Dietz stated that he normally uses the terms "mental illness" or "mental disease" to describe conditions "in which the person's experience is categorically different from normal human experience." Using the terms in that manner would equate the terms to psychosis, and they would thus apply to persons with "hallucinations, delusions, or a formal thought disorder." Dietz acknowledged Illinois' definition of mental illness for purposes of a finding of guilty but mentally ill, and he paraphrased that definition for the jury, *i.e.*, "a substantial disorder of mood, thinking or behavior that impaired judgment at the time of the crime." Dietz concluded that defendant was not mentally ill when he killed Cassandra Corum.

Following Dietz's testimony, Cassandra Corum's mother, Sherry Alsalah, read a victim impact statement, touching upon the effect Corum's disappearance and murder had had upon her, the victim's sister, and the victim's young son.

Prior to closing argument, the prosecutor sought clarification of the limits of permissible argument, inquiring as to which of the court's rulings from the guilt phase would be the subject of proper comment. The prosecutor noted he had "planned on arguing that the Court has previously found the defendant to be sane, not to be mentally ill." The court told the prosecutor: "No. You got to stay away from mental illness." The prosecutor accepted that prohibition without objection or argument, stating, "That is what I wanted to be sure about." Defense counsel then interjected, "Insanity is fair game." The court confirmed that insanity was "fair game," and the parties could discuss that finding, because the court had already advised the jury of that ruling.

In his opening statement, the prosecutor told the jurors:

> "You're not here to decide the Defendant's guilt. That has already been decided. The Court decided, Judge Frobish has already decided that the Defendant is guilty of the murder of Cassandra Corum. He also has decided that the Defendant was not, at the time that murder was committed, insane."

The prosecutor subsequently acknowledged that defendant's mental condition was relevant in the jury's sentencing decision, noting that the jury would receive instructions pertaining to "extreme mental or emotional disturbance" and "reduced mental capacity."

In his closing statement, defense counsel summarized the evidence presented on defendant's behalf, and took issue with the State's evidence, particularly the testimony of Dr. Dietz. The focal point of the defendant's closing argument was the defendant's mental and emotional condition. Defense counsel informed the jury it was "a factor in mitigation" that defendant "suffers from a reduced mental capacity." He suggested there was "[a]bundant testimony concerning that." Counsel noted it was a mitigating factor that "the murder of Cassandra Corum was committed while Defendant was under the influence of an extreme mental or emotional disturbance although not such as to constitute a defense to the prosecution." Counsel stated he had asked Dr. Dietz to provide a "definition of mental illness," however he provided the "definition of insanity." Attorney Skelton underscored: "As Judge Frobish has told you, insanity is not an issue at this stage of the proceeding." Counsel emphasized that insanity was not at issue and that Dr. Dietz had provided the "wrong definition of what we're dealing with at this stage of the case." Skelton observed that the jury had seen photographs evincing the "handiwork" of a "sick mind." He directed the jury to "look at the mitigating factors," noting that defendant "suffers from a mental illness" and "had a reduces mental capacity." Counsel concluded:

> "What we are talking about here is mitigation. What we are talking about here is does society, do we as a people who do not have the same deficits, the same problems, the same illnesses as Andrew Urdialles, punish the mentally ill in the same fashion that we would punish someone who does not have that mental illness?"

Counsel suggested that life in prison was the appropriate sentence.

In rebuttal argument, the prosecutor reiterated that insanity was not an issue; however, he immediately followed that remark with a question that unequivocally apprised the jury that mental illness *was* still an issue: "Is [defendant] mentally ill at some level?" What followed was a discussion of the evidence and testimony bearing upon that issue. The prosecutor's subsequent remarks also made clear that defendant's mental state was considered a viable, and perhaps determinative, factor in the jury's sentencing decision. We quote pertinent portions of the prosecutor's argument:

> "Extreme mental or emotional disturbance or reduced mental capacity. That's what you are going to see [in instructions]

-45-

when you decide whether or not you believe that factor in mitigation and because of that its inappropriate to impose a death penalty.

*** 

Reduced mental capacity. *** I pose to you, think about this. *** If this defendant were suffering from such an extreme emotional disturbance and reduced mental capacity, if a cop was at his elbow during all these crimes, he'd still do them because he couldn't help himself because he's suffering from those types of mental problems.

Does one of you think that if there was a policeman at his elbow when [J.A.] was in that trunk she would have still been in the trunk and that he would have done that? Do you think if a policeman would have been at his elbow that he would have blown the back of Denise Maney's head off? Do any of you really think that that if there would have been a cop there with him, I'm just emotionally disturbed, I can't help myself, and he'd do it anyway? Is there a single person that can truly believe that?"

The prosecutor noted, even if the jurors believed that defendant was "emotionally disturbed" or his "mental capacity was reduced," they could still "vote to impose the death penalty despite that."

Following the arguments of the parties, the trial court issued final instructions to the jury. The jury was instructed that mitigating factors include:

"First: Any or all of the following if supported by the evidence:

The murder was committed while the defendant was under the influence of an extreme mental or emotional disturbance, although not such as to constitute a defense to the prosecution.

The defendant suffers from a reduced mental capacity.

Second: Any other reason supported by the evidence why the defendant should not be sentenced to death.

Where there is evidence of a mitigating factor, the fact that such mitigating factor is not a factor specifically listed in

these instructions does not preclude your consideration of the evidence."

During jury deliberations, the jury sent a note asking to see the sentence-completion test. The court initially considered whether to send only the portion of the test referred to in the questioning of Dr. Killian. The court then inquired, "Should they get the questions that were not asked of Dr. Killian?" Attorney Skelton responded for the defense, "I need to review the entirety of the exhibit before I can comment on that." After further consideration, attorney Shelton stated: "I would suggest that it be sent in its entirety." Attorney Elmore concurred. By agreement of the parties, the entire sentence-completion test was sent to the jury.

The jury ultimately determined that death was the appropriate sentence. Subsequently, defendant filed a posttrial motion, which was considered and denied. The court sentenced defendant to death, and this appeal followed.

ANALYSIS

Pretrial Proceedings

I. *Shackling and Other Security Measures*

Defendant first contends that he was deprived of due process and fundamental fairness where the trial court initially ordered defendant's legs shackled under a skirted table during courtroom appearances and later, after defendant created a disturbance in the courtroom, ordered his left arm shackled under the table as well. Defendant also argues that he was improperly denied writing utensils after the courtroom disturbance and, in the issue statement of his brief, suggests that the court erred in "instruct[ing] the jury that the defendant was restrained for security reasons."

In response to defendant's contentions, the State first argues that defendant acquiesced in the trial court's ordering of restraints and forfeited the issue by failing to object at trial or preserve the issue in a posttrial motion. Beyond that, the State contends that defendant cannot obtain relief under the plain error doctrine because there was no error.

In addressing defendant's plain error argument, we first "consider whether error occurred at all." *People v. Wade*, 131 Ill. 2d 370, 376 (1989). Applying the principles expressed in *People v. Buss*, 187 Ill.

2d 144 (1999)–which remain good law after this court's decision in *People v. Allen*, 222 Ill. 2d 340 (2006), and the Supreme Court's opinion in *Deck v. Missouri*, 544 U.S. 622, 161 L. Ed. 2d 953, 125 S. Ct. 2007 (2005)–we conclude that no error occurred as a result of the defendant's wearing shackles during the proceedings in this case. We note that the trial court made findings sufficient to justify the use of physical restraints, it appears the shackling was not visible to the jury, and the measures imposed by the trial court did not affect defendant's ability to assist and communicate with counsel.

In *People v. Boose*, 66 Ill. 2d 261, 265 (1977), this court noted that shackling is generally disfavored because (1) it tends to prejudice the jury against the accused; (2) it restricts the defendant's ability to assist counsel during trial; and (3) it offends the dignity of the judicial process. Nonetheless, this court explained that a defendant may be shackled if there is an indication he may try to escape, pose a threat to the safety of courtroom occupants, or disrupt the order of the courtroom. *Boose*, 66 Ill. 2d at 266. The *Boose* court identified several factors a circuit court should consider in determining whether to shackle a defendant, including:

> " '[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.' " *Boose*, 66 Ill. 2d 266-67, quoting *State v. Tolley*, 290 N.C. 349, 368, 226 S.E.2d 353, 368 (1976).

The need for shackling is a determination within the discretion of the circuit court. *Buss*, 187 Ill. 2d at 216. A court of review will examine that decision to determine whether the trial court abused its discretion. *Boose*, 66 Ill. 2d 267. Consequently, a trial court must–outside the presence of the jury–place its reasons for shackling a defendant on the record and provide defense counsel with an opportunity to offer reasons why the defendant should not be shackled. *Buss*, 187 Ill. 2d at 216. As this court observed in *Buss*, a

single reason for shackling has generally been held to be insufficient justification for the restraint; whereas, "Illinois courts have found no abuse of discretion in shackling a defendant when the circuit court has expressed more than a single reason for shackling a defendant." *Buss*, 187 Ill. 2d at 216-17 (compiling cases).

Perhaps because the trial judge in this case had been subject to appellate court criticism in a previous matter, he was particularly sensitive to the *Boose* issue, and he took care to comply with the mandated procedure. The court first noted that defendant's legs would be shackled under a skirted table and that the jurors would not be aware of it unless defendant drew their attention to it. The judge asked defense counsel if they had "any objection on the record." Counsel responded that the defense had "no objection to it now." The trial court then specifically identified three factors to support its decision to shackle defendant's legs. First, the court observed that defendant had been recently convicted of two murders in Cook County and had been sentenced to death. Although his death sentence was subsequently commuted, he was, at the time of trial, still serving two life sentences. Second, the court mentioned defendant's physical attributes, noting that he was in good health and had no difficulty getting around. Third, the court made reference to the age of the Livingston County courthouse and stated there were "all kind of security problems with the building and the courtroom." Although the court did not initially mention the first *Boose* factor, *i.e.*, the seriousness of the charge against defendant, that consideration must have been obvious to all, and the court's subsequent reference to that factor indicates that it no doubt was significant in the court's ruling at the outset. After the court set forth its reasons for the restraint, the judge stated his intention to instruct the jury that "security measures have been taken, such as the guards being here." With those comments on the restraint of defendant and attendant security measures, the trial court again asked: "Is there anything else on that issue that either the State or the defense wishes to bring up?" For the defense, attorney Skelton responded, "No, sir."

The court then recessed prior to the commencement of jury *voir dire.* During that recess, defendant began cursing and threw a cup of water because a guard, and his own attorney, had instructed him that he could not speak with his parents and Kendra Moses. Defendant had to be physically subdued and handcuffed, and he turned over a

table in the process. After the trial judge ascertained what had happened, the court asked defendant: "Will you promise to behave yourself if I do not shackle you?" Defendant gave no explicit assurances, stating only, through counsel, that he had not been shackled in the prior Cook County proceedings, and there had been no outbursts or problems. The court then made the additional observation: "[Y]ou are on trial here for your life." As a result of the outburst, the court ordered defendant's left arm shackled under the table as well and directed that defendant be given no pencils or pens.

Two days later, in chambers, the court revisited the issue of security. The court observed that two "very large guards" had been necessary to restrain defendant "notwithstanding that he was already shackled to an eye bolt on the floor." The judge described defendant's conduct and characterized it as going "ballistic" or "berserk." Attorney Elmore, for the defense, acknowledged that the court had not overstated the severity of the incident. The court then stated that defendant was a "high risk individual" and noted that his demeanor had changed after it became clear that the trial was "actually going to go forward finally." The judge stated his belief that defendant was a "desperate man." With those additional observations, bearing upon the second and sixth factors mentioned in *Boose* (see *Boose*, 66 Ill. 2d at 266-67 (" 'defendant's temperament and character' " and " 'threats to harm others or cause a disturbance' "), quoting *State v. Tolley*, 290 N.C. 349, 368, 226 S.E.2d 353, 368 (1976)), the court again asked defense counsel: "[D]o you want me to free up Mr. Urdiales more than I am contemplating doing?" Attorney Skelton initially responded by asking that the court reconsider its decision to deny defendant a writing implement. The court then stated: "DOC has had in the past inch pencils. *** It's a very small pencil. We'll explore that and come up with a writing material that couldn't do you harm." Other than that single request, defense counsel did not object to the security measures ordered by the court, and in fact concluded his remarks on the subject by implicitly agreeing that the court's measures were appropriate under the circumstances, stating, "I know what the court's talking about. I've been there."

We find that the trial court set forth more of record than was necessary to justify the physical restraints and security measures it utilized. The court gave the defense an opportunity to offer reasons

why defendant should not be shackled, and the defense in effect conceded that the court's actions were appropriate. The use of physical restraints, which were not visible to the jury, did not impair defendant's ability to communicate with counsel and assist in his defense. In short, we find that the court acted appropriately, and did not abuse its discretion in this regard.

Although we believe the court would have been justified in denying defendant writing implements, and such a deprivation would not have affected his ability to communicate with counsel–who was sitting right next to defendant–the record does not support defendant's contention that the court actually denied defendant the means to write. There is no indication in the record that the court did not, ultimately, "come up with a writing material that couldn't do [defense counsel] harm." We note that an appellant has the burden of presenting the court with an adequate record regarding a claimed error, and any doubts arising from an inadequate record will be resolved against him. See *Redmond v. Socha*, 216 Ill. 2d 622, 631 (2005); *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 546-47 (1996).

Although defendant, in the issue statement of his brief, claims that the court erred in "instruct[ing] the jury that the defendant was restrained for security reasons," defendant misrepresents the trial judge's statement, apparently in an attempt to link it to his shackling argument. The court did not tell jurors that defendant was "restrained." Rather, the court advised jurors that defendant was "in custody" and "certain security measures" had been taken. While that admonishment might have been the basis for an argument in and of itself, defendant's brief includes no argument or citation of authority bearing upon either the trial court's actual statement to the jury *or* the statement as he misrepresents it. A point raised in an appellant's brief must be supported by argument and relevant legal authority. *People v. Davis*, 213 Ill. 2d 459, 470 (2004); *People v. Jackson*, 205 Ill. 2d 247, 278 (2001). Failure to comply with those requirements results in forfeiture. *People v. Ward*, 215 Ill. 2d 317, 332 (2005); *Davis*, 213 Ill. 2d at 470; *Jackson*, 205 Ill. 2d at 278. Defendant has forfeited the issue.

## II. *Remarks Regarding Appellate Court Opinions*

Defendant next contends that he was "deprived of due process and fundamental fairness where the [trial] judge disparaged various justices of the Illinois appellate court, expressed contempt for recent appellate opinions restricting a trial court's authority to shackle or restrain defendants, and indicated he would mail a transcript regarding the defendant's single courtroom disruption to appellate and supreme court justices who potentially would review this case on appeal." Defendant cites this court's decision in *In re Dominique F.*, 145 Ill. 2d 311 (1991), for the proposition that "[i]t is unacceptable for a trial judge to disregard *** precedent because he disagrees with it." We find that the trial judge in this case registered his disagreement with precedent, but he did not disregard it.

As previously noted, perhaps because the trial judge in this case had been subject to appellate court criticism in a previous matter, he was particularly sensitive to the *Boose* issue, and he took care to comply with the mandated procedure. The trial court set forth more of record than was necessary to justify the physical restraints and security measures it utilized. Thus, defendant was not denied due process or fundamental fairness by the court's comments, all of which were made outside the presence of the jury.

We do not, however, mean to encourage the kind of rambling, amorphous diatribe in which the trial court engaged. While restrained and reasoned disagreement with the ruling of a superior court is not to be discouraged, and may well be constructive in a proper setting, as our appellate court has observed, dignity is necessary for judicial proceedings. See *People v. Thurmond*, 317 Ill. App. 3d 1133, 1145 (2000). As the appellate court noted in *Thurmond*, a trial judge should be the exemplar of dignity, he should exercise restraint over his conduct and utterances, and should control his emotions. *Thurmond*, 317 Ill. App. 3d at 1145. We trust that the judge in this case will, in the future, circumscribe his conduct and comments so as to reflect the dignity his office, in particular, and that of the judicial system, of which he is but one part.

## III. *Involvement of DPTA Attorneys*

Defendant next contends that he was deprived of due process and fundamental fairness because the trial court "disparaged the motives

and conduct of attorneys for the State Appellate Defender Death Penalty Trial Assistance Unit, who were an integral part of the defense team representing Andrew Urdiales." Defendant states that the trial court's "expressed animosity" may indicate that the judge was not "impartial." Defendant also argues: "Once [the trial judge] appointed the Appellate Defender and Mr. Richards, the trial judge had no authority to preclude Mr. Richards from assigning his assistants to the case, or to strike Mr. Hanlon and Mr. Sincox from the entry of appearance." Moreover, defendant submits that the court excluded Sincox because the court "objected to his demeanor" and the court had "no inherent authority to discipline" Sincox in that manner. We begin this portion of our analysis with a review of the pertinent statutes.

Section 10 of the State Appellate Defender Act prescribes the powers and duties of the State Appellate Defender (725 ILCS 105/10 (West 2004)), and applies to all attorneys employed by the Office of the State Appellate Defender (OSAD) (725 ILCS 105/2 (2) (West 2004)). The Act governs the circumstances under which the State Appellate Defender may be appointed to represent defendants in any given case (*Kirwan v. Welch*, 133 Ill. 2d 163, 164-65 (1989)), and the attorneys of that agency may represent defendants "*only as the Act provides*." (Emphasis in original.) *Kirwan v. Karns*, 119 Ill. 2d 431, 434 (1988); see also *Alexander v. Pearson*, 354 Ill. App. 3d 643, 647 (2004).

The State points out that the version of the State Appellate Defender Act in effect at the time of defendant's trial did not "mandate" that an attorney from OSAD be allowed to file his or her appearance as trial counsel in a death penalty case and participate in that capacity. Our reading of the statute in question indicates that it did not even *authorize* OSAD attorneys to act as trial counsel in capital cases, much less "mandate" that they be allowed to do so. See 725 ILCS 105/10(a), (b)(5) (West 2004) ("The State Appellate Defender shall represent indigent persons on appeal *** when appointed to do so by a court under a Supreme Court Rule or law of this State. *** The Office of the State Appellate Defender shall not be appointed to serve as trial counsel in capital cases"). In fact, a literal reading of the pertinent statute indicates it did not even authorize the *assistance* of *attorneys* from OSAD. Section 10(c)(5) of the applicable version of the Act stated in relevant part:

"(c) The State Appellate Defender may:

(5) in cases in which a death sentence is an authorized disposition, provide trial counsel with *the assistance of expert witnesses, investigators, and mitigation specialists* from funds appropriated to the State Appellate Defender specifically for that purpose by the General Assembly. The Office of State Appellate Defender shall not be appointed to serve as trial counsel in capital cases." (Emphasis added.) 725 ILCS 105/10(c)(5) (West 2004).

Under a literal reading of the provision, the statute allowed the State Appellate Defender to provide only "the assistance of expert witnesses, investigators, and mitigation specialists."

Of course, with the passage of Public Act 94–340, effective January 1, 2006, the State Appellate Defender Act was amended to specifically allow the State Appellate Defender to provide trial counsel in capital cases with "legal advice," in addition to the services previously authorized (725 ILCS 105/10(c)(5) (West Supp. 2005)), and the Capital Crimes Litigation Act was amended to provide as follows: "At the request of court appointed counsel [in capital cases], attorneys employed by the State Appellate Defender may enter an appearance for the limited purpose of assisting counsel appointed under this Section." 725 ILCS 124/5 (West Supp. 2005).

Although the amended versions of the State Appellate Defender Act and the Capital Crimes Litigation Act were not in effect at the time of his trial, defendant simply proceeds in his argument as if they were. He does not argue that those provisions apply retroactively; he does not advance reasons why they should apply retroactively; and he cites no relevant authority in that regard. Thus, defendant has forfeited any contention that the amended provisions apply. See *People v. Mertz*, 218 Ill. 2d 1, 91 (2005) (defendant's failure to offer analysis and cite legal authority in support of retroactive application resulted in forfeiture of the issue). We thus examine defendant's contentions utilizing the statutes in effect at the time of defendant's trial–the provisions presumably known to the presiding trial judge.

Those provisions did not, by their terms, authorize OSAD attorneys to serve as counsel in capital cases or provide legal advice to the attorneys actually serving as trial counsel. If they did, it would hardly seem necessary to amend section 10(c)(5) of the State

Appellate Defender Act to specifically so state, and that is exactly what Public Act 94–340 did. See 725 ILCS 105/10(c)(5) (West Supp. 2005) (adding the phrase "legal advice"). The version of the Act in effect at the time of trial, and the current version, both state that the "State Appellate Defender shall not be appointed to serve as trial counsel in capital cases." Compare 725 ILCS 105/10(c)(5) (West 2004) with 725 ILCS 105/10(c)(5) (West Supp. 2005). That provision is at once a prohibition directed to circuit courts and to the attorneys of OSAD. Trial courts are not to appoint attorneys of that agency to serve as trial counsel in capital cases, and attorneys of that agency are not statutorily authorized to serve in that capacity. The State Appellate Defender Act governs the circumstances in which the attorneys of that state agency are authorized to render their state-supported services. They are not free agents who can act as counsel when and where they see fit.

That is not to say that the unauthorized actions of an OSAD attorney on behalf of a criminal defendant are a nullity. After all, the attorney who chooses to exceed his statutory authorization, and is allowed to do so by a trial court, is nonetheless a licensed attorney, and his actions will be judged by the standards applicable to any licensed attorney acting in that context. However, such an attorney has no *right* to interject himself, or herself, into the trial.

Applying those principles to this case, it is clear that the trial court was not required to allow OSAD attorneys to participate as "part of the defense team." In fact, the court should not have allowed Richards to participate. Defendant was fortunate to receive the able services of Richards, but he was not statutorily entitled to them.

Because Sincox and Hanlon were not statutorily authorized to participate as defendant's attorneys in this case, and the trial judge was not required to allow them to do so, the judge did not err in striking their names from the entry of appearance filed by Richards. For the same reasons–and irrespective of the concerns actually expressed by the court–there would have been no error in precluding Sincox from participating in the deposition of Dietz.

However, the record indicates the court never denied defendant's motion for Sincox to participate in that deposition. Defendant's trial attorney, Elmore, appeared to agree with the court's statement that the defense motion was moot because Elmore and Skelton planned to travel to California for the deposition, and, in any event, defense

-55-

counsel never obtained a ruling on the motion. A movant has the responsibility to obtain a ruling on his motion if he is to avoid forfeiture on appeal. *People v. Redd*, 173 Ill. 2d 1, 35 (1996). Because defendant did not obtain a ruling, the issue is forfeited.

The court's comments about Sincox's behavior in the courtroom–though apparently warranted–are irrelevant, given that Sincox did not, and could not, represent the defendant. We note that the court's remarks regarding the attorneys who actually represented the defendant were highly complimentary, and there was no hint of animosity or disparagement therein. None of the court's comments to or about the attorneys were made in the presence of the jury.

We are compelled to comment on one remark the court made about attorneys Richards and Sincox. At one point, during a discussion of the contemplated deposition of Dr. Dietz in California, the trial court expressed concern that attorneys Sincox and Richards had "an agenda far greater than" the defendant's case. Later, in that same discussion, the trial judge specified the nature of his concern, focusing on attorney Sincox. Referring specifically to Sincox, whose possible participation in the anticipated deposition had been broached by attorney Skelton, the court stated:

> "His conduct in this courtroom was most unprofessional. It is clear to me that he has an agenda far greater than Mr. Urdiales and he is motivated by that. And I am concerned that his conduct will be governed by that. *** And if he goes far afield out there, we have got a mess on our hands in terms of, well, now the deposition wasn't completed."

Clearly, although the court included attorney Richards in his initial remark, the comment was prompted by the suggestion that *Sincox* participate in the deposition of Dietz. We note that attorney Richards was otherwise treated with respect and consideration by the court in all of the pretrial proceedings in which he participated. We see no evidence of prejudice with respect to him. With respect to Sincox, the record suggests that the court may have had good reason to mistrust him and question his professionalism.

In any event, placed in context, the judge's initial statement, and his subsequent expansive comments, appear to reflect the court's justifiable concern that the admittedly broader agenda of the DPTA might result in questioning "far afield" in areas not particularly

pertinent to *defendant's* case, resulting in an unnecessary delay and docketing problems. We believe those were valid considerations.

We note that allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place. *People v. Jackson*, 205 Ill. 2d 247, 277 (2001). The fact that a judge displays displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against the defendant or his counsel. *Jackson*, 205 Ill. 2d at 277. As noted, the report of proceedings reveals nothing in the way of judicial displeasure or irritation with Richards. Since Sincox was not allowed to serve as counsel for defendant, or represent him in any way, we need not consider the possible repercussions of the court's interaction with Sincox. In short, the court's conduct with respect to the DPTA attorneys did not deny defendant due process.

Guilt Phase

*Guilty Plea and Bench Trial*

Defendant next contends that the trial court abused its discretion in rejecting his plea of guilty but mentally ill, and, in a related claim, argues that the trial court's bench trial verdict of guilty, "rather than guilty but mentally ill," was against the manifest weight of the evidence. The relief defendant requests in each instance is "a new sentencing hearing." Defendant suggests he is "entitled to a new capital sentencing hearing because the trial court's rejection of his GBMI plea tainted the weight and credibility of his mitigation evidence" at his sentencing hearing. We begin this section of our analysis with a review of the applicable statutes and this court's pertinent opinions.

The pertinent version of section 6–2 of the Criminal Code of 1961 provides:

"(c) A person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill.

(d) For purposes of this Section, 'mental illness' or 'mentally ill' means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the

-57-

commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law." 720 ILCS 5/6–2(c), (d) (West 1994).

The burden is on the defendant to prove, by a preponderance of the evidence, that he was mentally ill, as defined in subsections (c) and (d) of section 6–2. 725 ILCS 5/115–3(c)(3), 115–4(j) (West 2004); *People v. Lantz*, 186 Ill. 2d 243, 254 (1999). When a trier of fact finds a defendant guilty but mentally ill, that verdict does not relieve a defendant of criminal responsibility. *People v. Johnson*, 146 Ill. 2d 109, 131 (1991). A defendant who has been found guilty but mentally ill is subject to any sentence that could have been imposed upon a defendant who had been convicted of the same offense without a finding of mental illness, including the death penalty. *Johnson*, 146 Ill. 2d at 131-32. Indeed, the only discernible difference between the two verdicts is that, upon a finding of guilty but mentally ill, the Department of Corrections must "cause periodic inquiry and examination to be made concerning the nature, extent, continuance, and treatment of the defendant's mental illness" and provide "such psychiatric, psychological, or other counseling and treatment for the defendant as it determines necessary." 730 ILCS 5/5–2–6(b) (West 2004); see *People v. Morris*, 237 Ill. App. 3d 140, 145 (1992). As is the case when a defendant raises a defense of insanity, for which a defendant also bears the burden of proof, the existence of "mental illness," as defined in section 6–2, is a question of fact; thus, the trial court's resolution of that issue will not be overturned unless it is contrary to the manifest weight of the evidence. See *Johnson*, 146 Ill. 2d at 128-29.

The Criminal Code also provides for a *plea* of guilty but mentally ill. Section 115–2 of the Criminal Code governs pleas of guilty, as well as pleas of guilty but mentally ill. Subsection (b) of section 115–2 provides that a plea of guilty but mentally ill "may be accepted" by the court when, *inter alia*:

> "(3) the judge has held a hearing, at which either party may present evidence, on the issue of the defendant's mental health and, at the conclusion of such hearing, is satisfied that there is a factual basis that the defendant was mentally ill at the time of the offense to which the plea is entered." 725 ILCS 5/115–2(b)(3) (West 2004).

Defendant initially argues that the trial court erred when it rejected his plea of guilty but mentally ill and, in doing so, "decided that the legal standards for determining a factual basis for a traditional plea *** were inapplicable to determining the factual basis for pleas of guilty but mentally ill." Citing this court's decision in *People v. Sorenson*, 196 Ill. 2d 425 (2001), defendant maintains that this aspect of his argument presents a purely legal question subject to *de novo* review. We agree with defendant as to the applicable standard of review. However, we otherwise reject the substance of his argument.

Defendant notes that the language of subsection (b) of section 115–2, *i.e.*, "may be accepted," substantially mirrors the language of subsection (a), which addresses "the traditional guilty plea." Ergo, defendant argues that cases interpreting standards applicable to subsection (a) should provide guidance as to the proper interpretation of subsection (b). Defendant conveniently overlooks a significant difference between the procedures set forth in subsections (a) and (b). Subsection (b) appears to provide for a *contested* hearing "on the issue of defendant's mental health," a hearing "at which either party may present evidence." Notwithstanding this difference, defendant maintains that proceedings on a plea of guilty but mentally ill should be governed by the identical principles applicable to "the traditional guilty plea," and cites this court's decision in *People v. Barker*, 83 Ill. 2d 319, 328 (1980), for the following proposition:

> "In evaluating the sufficiency of the factual basis to support a plea of guilty, a trial judge is in much the same position and would apply similar standards as those used in determining the sufficiency of the State's evidence at trial to withstand a motion for a directed verdict of not guilty."

Defendant's argument suggests that the trial court was obligated to accept his plea, and thus find he was "mentally ill" as defined in section 6–2 of the Criminal Code, if defendant presented some evidence to support such a finding, irrespective of evidence to the contrary presented by the State. Defendant's position is untenable.

It would seem self-evident that a proceeding in which there are no contested issues may be subject to different standards than one in which a controversy exists. In this case, the State chose to dispute the existence of "mental illness," as defined in section 6–2 of the Criminal Code. Because there was a dispute regarding an element of the guilty plea, this case does not present a "traditional guilty plea,"

we are not concerned with one party's evidence alone, and the standard for sufficiency referenced in the quoted passage from *Barker* cannot ultimately apply. Whether evidence *could support* a particular finding or verdict (the inquiry upon a motion for directed verdict) is a different question from whether the evidence *does in fact support* that finding or verdict after a full evidentiary hearing. See *People v. Connolly*, 322 Ill. App. 3d 905, 915 (2001). In the latter instance, the trier of fact necessarily weighs *all* the evidence and passes upon the credibility of witnesses in resolving disputed issues. *Connelly*, 322 Ill. App. 3d at 915. Because the State contested the existence of mental illness, that is what the trial court was obligated to do in this case.

Acceptance of defendant's argument would allow defendants who plead guilty but mentally ill to effectively evade the burden of proof that the legislature has placed upon those who raise the issue at trial. The legislature could not have intended such a result. As we have noted, a defendant whose case is tried would have to establish, by a preponderance of the evidence, that he or she is mentally ill, as defined in subsections (c) and (d) of section 6–2. 725 ILCS 5/115–3(c)(3), 115–4(j) (West 2004). A preponderance of the evidence is evidence that renders a fact more likely than not. *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 279 (2004); see *Lindsey v. Board of Education of the City of Chicago*, 354 Ill. App. 3d 971, 986 (2004). Thus, at trial, following the presentation of evidence by *both* the defendant and the State, a trial court would have to determine whether it was "more likely than not" that defendant suffered from a mental illness, as defined in the statute, at the time he or she committed the offense. A defendant pleading guilty but mentally ill should have the same burden of proof. He cannot absolve himself of that burden by admitting an element he has the burden of proving. The directed verdict standard, mentioned in *Barker*, cannot apply to a contested proceeding, where evidence is adduced to controvert defendant's claim of mental illness.

We also find meritless defendant's claim that the trial court erred in rejecting his plea of guilty but mentally ill, and his contention that the trial court's verdict of guilty, as opposed to guilty but mentally ill, was against the manifest weight of the evidence. As the foregoing analysis indicates, defendant had the burden of proving his mental illness by a preponderance of the evidence. As our subsequent

discussion will show, the court's determination, that he did not sustain that burden, was not against the weight of the evidence.

As Illinois courts have noted, the credibility and weight to be given psychiatric testimony are matters for the trier of fact, who is not obligated to accept the opinions of defendant's expert witnesses over those opinions presented by the State. *People v. Mahaffey*, 166 Ill. 2d 1, 18 (1995); see *People v. Dresher*, 364 Ill. App. 3d 847, 855-56 (2006). In fact, "[e]ven if several competent experts concur in their opinion and no opposing expert testimony is offered, it is still within the province of the trier of fact to weigh the credibility of the expert evidence and to decide the issue *** in light of all of the facts and circumstances of the case ***" *In re Glenville*, 139 Ill. 2d 242, 251 (1990).

In this case, the trial court found that defendant had not established, by a preponderance of the evidence, that he was mentally ill, as defined in section 6–2, when he killed Cassandra Corum. In announcing that ruling, the trial judge stated he found the testimony of Dr. Dietz "substantially more persuasive and more convincing than that of the defense experts." However, the court also found the facts of the case themselves a compelling refutation of testimony given by the defense experts.

As previously noted, Dietz testified that defendant suffered principally from a personality disorder, and he displayed obvious characteristics of a sexual sadist. Dietz did not consider personality or anxiety disorders to be mental illnesses, as defined in section 6–2 of the Criminal Code. He believed that defendant's criminal behavior was driven by sexual desire, anger, and "a kind of predatory desire for conquest." If defendant's judgment was impaired, Dietz believed those were the factors causing impairment, not mental illness. Dietz also rejected Merikangas' diagnosis of organic brain disease, noting that defendant's 2004 MRI was within the normal range, and defendant's actions at the time of Corum's murder did not bespeak someone who suffered from significant impairment of the central nervous system. Dietz noted that the murder required planning–defendant brought handcuffs, duct tape, a knife, and a gun with him–a certain degree of physical prowess and coordination–defendant was able to overpower Corum, drive her 100 miles, murder her, and carry her body to a bridge, where he threw her into the river–and rational thought–insofar as defendant decided to

drive Corum to a secluded location, where he could kill her without being observed.

The trial court observed that the principal defense witnesses disagreed in their primary diagnoses. Cuneo believed that defendant suffered, primarily, from PTSD; Killian's principal diagnosis was dissociation; and Merikangas determined that defendant suffered from organic brain disease. Merikangas disagreed with Killian's and Cuneo's diagnoses of PTSD and dissociative personality disorder. Killian and Cuneo believed that defendant was legally sane, but mentally ill, as defined in section 6–2(d). Merikangas testified that defendant was insane.

In addition to their conflicting diagnoses, the court noted that the testimony of defendant's experts also failed to account for defendant's ability to function adequately in the Marine Corps, and later as a security guard, while suffering from the diagnosed illnesses. Their diagnoses failed to explain how a person thus afflicted could successfully plan, execute, and conceal eight murders over a period of 10 years. Disagreeing with the assessments of Merikangas and Killian–that defendant's crimes were not characterized by planning and organization–the court noted that defendant brought a gun, a knife, duct tape, and handcuffs on the night of Corum's murder. The court believed that defendant's actions during the offense were inconsistent with those of a person overcome by anger, noting, on the night defendant killed Cassandra Corum, he drove well over an hour, and approximately 100 miles, *after* he supposedly became angry and kidnapped her. It would appear that defendant had time to cool off; but defendant killed Corum anyway.

We have held that a judgment is against the manifest weight of the evidence when an opposite conclusion is apparent, or when the findings appear to be unreasonable, arbitrary or not based on the evidence. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 242 (1996). After careful review of this record, we cannot say that the trial court's rulings in this regard were against the manifest weight of the evidence. Although defendant argues that Dietz's definition of mental illness was unduly restrictive and his views diverged from those generally accepted in the psychiatric community, a review of an expert opinion recently rendered in another capital case would seem to refute defendant's position.

We note the testimony of Dr. Andrew Kowalkowski, as summarized in *People v. Thompson*, 222 Ill. 2d 1 (2006). Like Dr.

Dietz, Kowalkowski believed that *mental* disorders or illnesses are characterized by evidence of delusions, false fixed beliefs, or misinterpretation of external reality. *Thompson*, 222 Ill. 2d at 24-25. Kowalkowski differentiated such "delusional disorders" from "behavioral" disorders, such as personality disorders, which are "not significant *mental* disorders." (Emphasis in original.) *Thompson*, 222 Ill. 2d at 39. Kowalkowski believed that Thompson's personality disorder "manifested itself in *** his impulsiveness, his irritability and aggressiveness, his repeated failure to maintain consistent work behavior and his lack of remorse." *Thompson*, 222 Ill. 2d at 25. Kowalkowski testified that Thompson's killing spree could be explained by his personality disorders. *Thompson*, 222 Ill. 2d at 40.

The similarities between Dietz's and Kowalkowski's diagnoses, and Thompson's and this defendant's symptoms, are so obvious as to require no further comment. Dietz's opinion does not appear to be out of the mainstream of his profession, and it finds support in the facts of record. As the trial court's ruling suggests, the attendant facts and circumstances of defendant's crimes are themselves a compelling refutation of testimony given by the defense experts, independent of Dietz's testimony. For the foregoing reasons, we find no basis for reversing the trial court's determination that defendant failed to sustain his burden on the issue of mental illness.

We would add, even if we were to assume, *arguendo*, that the circuit court erred in rejecting defendant's plea of guilty but mentally ill, defendant is not entitled to a new sentencing hearing, as he argues before this court. As we will explain later, the circuit court's rejection of defendant's plea did not affect defendant's ability to present mitigating evidence of his mental condition at sentencing, and references to defendant's unsuccessful insanity defense were proper and duly circumscribed.

### Sentencing
#### I. *Ruling Regarding the Admission of Experts' Reports*

Defendant next claims that the trial court deprived him of his right to present relevant mitigating evidence to the sentencing jury when the court denied defense counsel's request to provide the jury with the defense experts' written reports. Quoting *People v. Davis*, 185 Ill. 2d 317, 344 (1998), defendant observes that "the State cannot place any limitation on the admission of relevant and reliable

evidence offered in mitigation at a death penalty hearing" and "the sentencing authority, whether judge or jury, may not refuse to consider such mitigating evidence as a matter of law." As the State points out, the trial court's ruling was a limitation only on the *method* defendant could use to present evidence, not on the admission of evidence itself.

When defense counsel stated his intention of introducing psychiatrists' reports into evidence, and asked that the reports go back to the jury, the State objected, arguing that the experts should testify in person and "be subject to cross-examination." The court expressed concern, noting that the reports in question were "extremely voluminous" and that Dr. Killian's report alone was 75 pages long. The trial judge then advised the parties:

> "I'm not limiting either the direct or cross-examination of a particular expert. So you want to have an expert on the stand for two days, that's fine with me. You can go over his entire report if you like. *** [I]f all those questions are then asked of a witness, then the opposite side knows what to cross on. *** So the only point I'm making is that there is an unlimited opportunity to inquire of these experts."

The trial court subsequently ruled that the reports would not go to the jury, noting, *inter alia*, "that's why we have the experts testifying because we are in a realm beyond the normal knowledge of the jurors." The court's statement evinces its concern that, in the absence of explanatory expert testimony, psychiatric reports in the hands of the jurors could have been a source of misunderstanding, confusion, and unchallenged opinion evidence.

We find no error in the circuit court's ruling. No restrictions were placed on defendant's right to present relevant evidence. The court made clear that defendant could call an expert and "go over his entire report" if defendant chose to do so. The limitation the court placed on the method for introducing that evidence appears, in part, to have been for the purpose of safeguarding the opposing party's right of confrontation and cross-examination, and in part to ensure that the jury received adequate explanatory testimony. We find that the court's ruling was reasonable and entirely proper.

Defendant could have called any of his experts he deemed necessary. Presumably, he called those whom he believed were important to his defense. Moreover, defendant could have questioned

the experts he did call about specific information contained in a nontestifying expert's report, so long as the former relied upon information contained in the report of the latter. In that way, he could have elicited some of the information contained in the reports of nontestifying experts. We conclude there was no error, and defendant was accorded the rights he was due.

II. *Trial Court's Conduct in the Cross-Examination of Killian*

Defendant next contends that the trial court deprived him of due process by acting "as an advocate for the State, where the trial judge assisted the prosecutor in cross-examining a defense expert and establishing a foundation for admission of an exhibit that was highly prejudicial to the defense." For purposes of clarity, we note that defendant's argument of error is confined to the trial court's conduct in the sentencing examination of Dr. Killian. Defendant does not otherwise argue that the evidence in question was improperly elicited and placed before the jury. In fact, his argument appears to concede that there was an adequate foundation for the introduction of the evidence.

The evidence elicited consisted of certain questions posed to defendant by Dr. Opsahl as part of the sentence-completion test, and defendant's answers to those questions. During the prosecutor's cross-examination of Dr. Killian, Killian admitted that he had "reviewed" the sentence-completion test when forming his opinion. When the prosecutor handed Killian the sentence-completion test, and asked if that was the test he had reviewed, defense counsel objected, arguing that the test was not relevant unless Killian had *relied upon* the test in formulating his opinion. The prosecutor was then allowed to question Killian as to whether he had relied upon the report. Killian responded to the prosecutor's question by first acknowledging that he had "looked at" the test, but had "not included a description" of it in his own report. When the prosecutor again asked if Killian had *relied on* the test in his assessment of defendant, Killian said, equivocally, he did not "think" he did. Pressing for an unequivocal answer, the prosecutor again asked if some of the answers on the test had helped Killian formulate his opinion. Killian then answered that he could not "specifically recall," but offered to examine the test again. After he had done so, Killian stated that the defendant's test answers were "consistent with" what Killian "already believed about him from everything else [Killian] had read." When

the prosecutor asked Killian to specify, defense counsel objected and asked to approach the bench. The trial court responded by announcing a brief recess and, outside the jury's presence, observed that the witness was "not being responsive." The court noted that Killian had stated he had not included the test in his report, but had not unequivocally stated whether he had disregarded the test or relied upon it. He had essentially "skirted the issue." The court concluded: "I think we need a vigorous interrogation on foundation by the State to see where this witness goes because he's going in both directions." It is unclear from the transcript whether Killian was present when the court's remarks were made; however, it is obvious that the remarks were not directed to him personally.

When questioning resumed, out of the presence of the jury, Killian conceded that he had taken into account all of the materials placed before him, and then qualified his answer by adding, "[I]t's not accurate to say that each piece of paper received the same amount of attention as any other piece of paper." When the prosecutor asked if defendant's test answers were important in Killian's analysis, Killian stated: "I'm answering this as well as I can."

The court then admonished Killian to answer the question asked, if he understood it, and, if he did not understand the question, to simply say so. When the court had the question read back, Killian appeared to better understand the question, and answered that he considered defendant's answers to the sentence-completion test "somewhat important." When the prosecutor returned to the critical question he had posed at the outset, asking Killian whether he taken defendant's answers into account in arriving at his conclusion, Killian responded with the same unresponsive answer that had initiated the exchange: "Not specifically, I did not include them in my report." As the prosecutor began to protest, the court again interceded, stating:

> "Sir, there was a question asked you and you answered a different question. *** I want you to listen to the question asked of you and then I want you to answer that question unless you don't understand it. Do we understand each other?"

Killian responded affirmatively. When the question was read back, he finally answered, unequivocally, that he took defendant's answers into account when forming his own opinion. With that, the court determined that a sufficient foundation existed to go into the sentence-completion test before the jury. Before the jury was called

back into the courtroom, the court asked defense counsel if there was anything he wanted to contest in terms of that ruling, and counsel responded, "It's proper, I agree. He took it into account; so, it's fair game." The prosecutor then proceeded to question the witness about the sentence-completion test, questioning which–as we have observed–defendant does not otherwise challenge.

We note that a trial judge has the discretion, when necessary, to admonish a witness to answer questions directly and responsively. *People v. Arnold*, 2 Ill. 2d 92, 97 (1954); see *People v. Gonzalez*, 238 Ill. App. 3d 303, 320 (1992). In our view, the trial court properly exercised its discretion in this case, admonishing a witness who was being evasive. Similar admonitory remarks, even when made in front of a jury, have been found appropriate and not prejudicial. See *People v. Kukulski*, 358 Ill. 601, 608-09 (1934) (repeatedly advising the witness to listen and answer the question); *People v. Williams*, 201 Ill. App. 3d 207, 221 (1990) (defendant complained that the court had admonished the defense expert by saying, "Doctor, would you do me a favor? Answer the question yes or no, don't ramble." "The witness has a tendency to ramble. These are yes or no questions and a date is a date"); *People v. Osborne*, 78 Ill. App. 2d 132, 139 (1966) ("Mr. Jones, the question is simple. The court believes the witness is being evasive about answering it").

We find that the court in this case did not act in the capacity of an advocate, as defendant suggests. Rather, the court sought to ensure the State's right to responsive answers from an evasive witness.

### III. *Comments Regarding Defendant's Insanity Defense*

Defendant next contends he was "denied due process and fundamental fairness where the trial judge informed the sentencing jury that he had rejected the defendant's insanity defense at trial, and where the prosecutor reminded the sentencing jury in closing argument that the trial judge had rejected the insanity defense." According to defendant, those statements "improperly demeaned [his] mitigating evidence of mental illness, and punished [him] for exercising his constitutional right to present a defense."

The State points out, *inter alia*, that defense counsel *asked* the trial court to explain to the jurors why insanity was no longer an issue in the case, and attorney Elmore and the court advised the prosecutor that he could clarify the status of insanity as an issue in closing

argument. Thus, the State contends, if there was error, the defense invited the court and prosecutor to commit it. We would agree; however, we conclude there was no error.

When the initial eight jurors were selected, they were told that defendant had asserted the defense of insanity and they were questioned about their ability to find defendant not guilty by reason of insanity if the defendant established that defense by a preponderance of the evidence. When the defendant subsequently chose to have the *trial court* consider and decide whether he was legally insane at the time of the offense, that issue was removed from the jury's consideration, and some explanation became necessary. Recognizing that need, attorney Skelton asked the trial judge to "give thought to a potential admonition" to the jurors. Skelton explained:

> "I think in fairness to the State as well as the defense, the Court needs to advise them *** not that they were selected under *** a now nonexistent theory, but something to lighten the blow for both *** of us. *** And there might be some fallout. I think the likely destination for that fallout is on the defense. But I would like the Court to give some thought to a potential admonition to the jury to straighten them out."

Pursuant to that request, the court later submitted its proposed remarks to counsel for the defense and the State. Both defense attorneys indicated they had they had no problem with the content of the court's proposed explanation. The court then read those remarks to the jurors, explaining why they would not be participating in the first two stages of the tripartite capital procedure, and advising them of the findings the court had made in the first two phases. In the course of the court's explanation, the judge told jurors he had rejected defendant's defense of insanity, and thrice read the jurors the statutory definition of insanity. He did not mention the rejection of defendant's plea of guilty but mentally ill, and he did not in any way suggest that defendant's mental condition was irrelevant to the jury's sentencing decision.

Moreover, as previously noted, defense counsel's opening statement to the jurors made clear that they could still consider whether defendant "suffer[ed] from any mental illness or mental disease or mental defects" that affected his behavior. In their closing arguments during the sentencing phase, the parties both acknowledged that "insanity" was no longer an issue; however, the existence and consequences of defendant's alleged mental or

personality disorders were nonetheless the subject of extensive comment. Indeed, after each of two instances when the prosecutor reminded the jury that insanity was no longer an issue, he eventually addressed statutory mitigating factors pertaining to defendant's mental condition. His argument made clear that defendant's mental condition was a viable sentencing issue, but he felt that defendant should receive a death sentence notwithstanding. Finally, the trial court's instructions to the jury also underscored the relevance of defendant's mental condition in the sentencing decision. Under the circumstances, we conclude that the comments of the court and the prosecutor were proper, and no error occurred.

## IV. *Other Prosecutorial Comments*

Defendant contends that other comments of the prosecutor were improper and denied him a fair sentencing hearing. Specifically, defendant argues that the prosecutor acted improperly when he (1) "emphasized that the jurors had taken an oath and promised to follow the law, and then argued that the evidence in aggravation required them under oath to impose a death sentence"; (2) invoked the integrity of his office as a justification for seeking the death penalty; and (3) inflamed the passions of the jurors by referring to the families of the victims left behind and speculating about "how many children and grandchildren will not be born because of the actions of the defendant."

Defendant's first claim of error is based upon two remarks of the prosecutor that appear 90 pages apart in the record of proceedings. In the early portion of his closing argument, the prosecutor told the jurors:

> "[Y]ou were all selected to serve in this serious case based on those promises that you made to the attorneys during jury selection. Now on behalf of the People of the State of Illinois and the People of the County of Livingston, I'm asking you to keep those promises that you made under oath several weeks ago."

Much later, the prosecutor stated:

> "Is he really worthy of your mercy? Ask yourselves with all he did, is he really worthy of your mercy? I hate to admit it, but we've really become a nation of excuse makers. There's always an excuse. Nothing is ever our fault. There

must be something in this person's past that made him do things. Well, we can't take responsibility.

    Allowing Andrew Urdiales to receive a natural life sentence rather than the death penalty diminishes the importance of Cassie Corum's life and doesn't serve the ends of justice."

Defendant actually argues that these two passages are related and that the jurors would have so perceived them: "Collectively, these comments lectured the jury that imposing any penalty short of a death sentence would be irresponsible, and would constitute a violation of the jury's oath."

Obviously, the prosecutor never told the jurors that their oath required them to impose the death penalty. The construction defendant places upon these remarks is simply preposterous. The quoted comments do not support defendant's claim of error even when they are taken out of context and placed in artificial tandem for argumentative exposition. This allegation of error deserves no further comment.

We also reject defendant's contention that he was denied a fair sentencing hearing because the prosecutor, during closing argument, improperly "invoked the integrity of his office as a justification for seeking the death penalty." We note, initially, that defendant did not object to the remarks in question; therefore, he has forfeited this issue. See *People v. Franklin*, 135 Ill. 2d 78, 111 (1990). As in *Franklin*, we find that the remarks did not constitute error in any event.

Defendant cites the following remarks in support of his argument:

    "The decision to seek a death penalty is not a decision that is lightly made by any prosecutor. A lot of things go into consideration as to whether or not a person such as myself would decide to seek the death penalty. I think a lot of people think that every time there's a murder committed that a prosecutor gets to decide whether or not he's going to seek the death penalty. That's simply not true. The law of the State of Illinois only provides for the death penalty under certain circumstances; and when those certain circumstances exist, it is only then that the prosecutor has the discretion to make the decision of whether or not to seek the death penalty. Careful consideration has to be given and justice must be done, and

careful consideration has been given in this case as to whether or not to seek the death penalty. Now we're seeking that justice be done in this case."

Although not referenced in defendant's brief, the prosecutor made other pertinent comments thereafter, remarks that we believe have a bearing upon the disposition of this issue. For example, soon after he made the foregoing statements, the prosecutor made clear to the jurors that the decision to impose the death penalty was theirs, and theirs alone:

"You've seen and heard all the evidence that's going to be introduced in this case, and now the decision is yours. It's your decision to decide whether or not this Defendant, Andrew Urdiales, in this case if it's appropriate to impose the death penalty. That's your decision."

The prosecutor later spoke to the jurors about the procedures for determining whether defendant would receive a death sentence. He correctly informed them that *they* would consider factors in aggravation and mitigation in arriving at the appropriate sentence, that unanimity would be required for a death sentence, and that defendant would be sentenced to life in prison, without the possibility of release, if they were unable to find unanimously that death was the appropriate sentence.

The prosecutor made clear that his role in the adversarial process, his "job," was to talk to the jury about aggravating evidence. He observed: "My job is not to mitigate here. *** [Y]ou'll hear mitigating evidence when the defense gets to argue. But at this point in time, I'm going to give you the reasons, the evidence that support [*sic*] the Defendant should receive the death penalty from you folks when you go in and deliberate."

The prosecutor then discussed, at length, the aggravating evidence, and urged the jury find that death was the appropriate sentence. As he concluded the initial portion of his closing argument, the prosecutor's remarks again served to remind the jurors that he, as the prosecutor, was part of an adversarial process: "I'm sure that Mr. Skelton will have the opportunity now to address you; and he'll make a detailed argument as to why these eight murders and rape don't justify a verdict on you folks' part in favor of the death penalty."

Following defense counsel's closing argument, wherein he discussed the evidence in mitigation, the prosecutor made an

abbreviated rebuttal argument, and the jury was then instructed in the applicable law. It is in this context that we consider the defendant's claim of error.

As we observed in *People v. Jamison*, 197 Ill. 2d 135, 161 (2001), this court has long recognized that the State's Attorney is endowed with the exclusive discretion to decide which of several charges shall be brought, or whether to prosecute at all. A prosecutor's discretion extends to the decision about whether or not the death penalty should be sought. *Jamison*, 197 Ill. 2d at 162.

In this case, the prosecutor correctly explained to the jurors the procedure for seeking the death penalty, and advised them of his role in the capital process, as well as theirs. He obviously believed it was appropriate to seek the death penalty, or he would not have done so. In that respect, his comments did not tell the jurors anything they had not already deduced. To suggest that those comments could have improperly swayed the jury is, in our opinion, to discredit the common sense and intelligence of those who served on the jury. In his argument, the prosecutor left no doubt that his role was that of an advocate in an adversarial process, and he clearly and repeatedly advised the jurors that the decision whether or not to *impose* the death penalty was theirs alone.

In that respect, the prosecutor's argument was very different from those found objectionable in other cases. For example, in *People v. Yates*, 98 Ill. 2d 502, 536-38 (1983), the prosecutor, in effect, told the jury that *he* would assume responsibility for imposition of the death penalty. As this court noted, the assistant State's Attorney in that case also suggested that his "previous experience was somehow relevant to whether [the] defendant should be sentenced to death." *Yates*, 98 Ill. 2d at 539. This court ordered a new sentencing hearing, concluding that both remarks were improper: the former, because it "obviously served to diminish the jury's sense of responsibility and mitigate the serious consequences of its decision"; the latter, because it "served to inject an improper and irrelevant consideration into the jury's deliberations." *Yates*, 98 Ill. 2d at 538-39. In this capital case, as in others, a principal concern in our review is that comments of the prosecutor in closing argument do not diminish the sentencing jury's sense of responsibility. See *People v. Flores*, 153 Ill. 2d 264, 288 (1992); *People v. Franklin*, 135 Ill. 2d 78, 111 (1990). A capital sentencing jury bears the sole responsibility for determining whether a defendant is sentenced to death, and it may not be informed either

directly or by implication that this responsibility is shared or rests elsewhere, either with the court (see *Flores*, 153 Ill. 2d at 288) or with the prosecutor (see *Yates*, 98 Ill. 2d at 537-38).

In this case, the prosecutor advised the jury that it was his decision to seek the death penalty, and it was for them to decide whether to impose it. That is a correct statement of law and procedure. His comments further made clear that he was not an impartial arbiter on the question of whether the death penalty should be imposed, but was in fact an advocate for a position in an adversarial process. Common sense would indicate that his opinion was reflected in the discretionary actions he took–as is the case with any prosecutor. The comments in question did not undermine or diminish the jury's sense of responsibility. Considering the complained-of remarks in the context of the entire closing argument, we find no error.

We finally consider defendant's contention that the prosecutor "improperly inflamed the passions of the jury by referring to the families the victims left behind and speculating about 'how many children and grandchildren will not be born because of the actions of the defendant.' " During closing argument to the sentencing jury, the prosecutor stated:

> "J.A. is the only one to get away with her life. The others weren't so lucky. How many children and grandchildren will not be born because of the actions of the defendant? Each of these girls had a family. Each one of them had their lives in front of them. Each one of them would have been able to have kids probably I assume at some point in their lives. Those were all taken away by the acts of this one man."

In *People v. Emerson*, 189 Ill. 2d 436, 508-10 (2000), this court held that similar remarks constituted an improper appeal to the emotions of the jurors. In *Emerson*, the prosecution argued:

> "Her name was Delinda Byrd. Delinda Byrd, a victim in this case. She had a life. She had hopes. She had dreams. They were taken away from her by Dennis Emerson. They were taken away from her only because he cared about nothing. Nothing, but himself. The last moments of her life were spent struggling for breath while 90 percent of her skin was being burned. Imagine her terror. Imagine her fear. ***

*** This is the defendant that did that to her, that turned her into a corpse, who took away all her hopes and dreams and took away all of what she could contribute to society and to the community, and all of what she could contribute to everyone that knew her and enriched their lives." *Emerson*, 189 Ill. 2d at 508-09.

Although we found the foregoing remarks improper, we nonetheless concluded that the comments, "in and of themselves," were not so prejudicial as to deprive the defendant of a fair sentencing hearing. *Emerson*, 189 Ill. 2d at 510. Similarly, in *People v. Kokoraleis*, 132 Ill. 2d 235, 285 (1989), the prosecutor commented on the victims' rights to get married, have a family, have children, and spend time with their families. Though this court found that the prosecutor's argument was improper, the court concluded that the remarks did not affect the overall fairness of the sentencing hearing. *Kokoraleis*, 132 Ill. 2d at 285.

We so find in this case. The jury heard the details of defendant's eight murders and the graphic testimony of his one surviving victim. The prosecutor's brief and isolated comments, while improper, were not so prejudicial as to deprive the defendant of a fair sentencing hearing or change the outcome of the proceeding.

### V. *Instructions Pertaining to Mitigation*

Defendant next contends that his "death sentence is fundamentally unjust because the sentencing jury was never instructed that it could consider the defendant's background of extreme emotional or physical abuse as a mitigating factor." As defendant points out, as part of the death penalty reforms enacted by the General Assembly (see Pub. Act 93–605, eff. November 19, 2003), a new provision was added to section 9–1(c) of the Criminal Code, specifically stating that a defendant's background of "extreme emotional or physical abuse" shall be considered as a mitigating factor. Although defendant's brief does not acknowledge that this provision was in effect at the time of his trial in May of 2004, it clearly was in effect as of November 19, 2003.

We note, initially, that defendant tendered an instruction addressing applicable mitigating factors, and that instruction was given by the trial court; however, the tendered instruction did not include the language which defendant now claims was erroneously

omitted. It is well established, by case law and rule, that a defendant may not raise on appeal the failure to give an instruction unless the defendant tendered the instruction at trial. *People v. Hopp*, 209 Ill. 2d 1, 7 (2004); *People v. Casillas*, 195 Ill. 2d 461, 473 (2000); *People v. Alvine*, 173 Ill. 2d 273, 286 (1996); 155 Ill. 2d R. 366(b)(2)(i). The pertinent portion of the instruction tendered by defendant read as follows:

> "Mitigating factors include:
>
> First: Any or all of the following if supported by the evidence:
>
> The murder was committed while the defendant was under the influence of an extreme mental or emotional disturbance, although not such as to constitute a defense to the prosecution.
>
> The defendant suffers from a reduced mental capacity.
>
> Second: Any other reason supported by the evidence why the defendant should not be sentenced to death.
>
> Where there is evidence of a mitigating factor, the fact that such mitigating factor is not a factor specifically listed in these instructions does not preclude your consideration of the evidence."

Obviously, the language that forms the basis of defendant's contention of error was not included in the instruction tendered by defense counsel–the instruction the trial court ultimately gave. The issue was not raised in a posttrial motion. Defendant does not claim that trial counsel was ineffective insofar as he tendered an instruction that did not include the language in question. The defendant does not argue plain error.

Rather, defendant repeatedly refers to subsection (c)(6) of section 9–1 as "recently enacted" and "new," suggesting that he erroneously believes the statutory provision was not in effect at the time of his sentencing hearing. This inference is supported by a concluding sentence in his original brief: "That future defendants will have that benefit, while Andrew Urdiales did not, is 'fundamentally unjust.' "

Subsection (c)(6) *was* available to defendant; however, trial counsel did not utilize it in their tendered instruction. Defendant does not claim that they were ineffective in that respect; nor does he explain why he believes the statutory provision was not available to

counsel. In short, defendant does not address his procedural default in any way. Thus, defendant has forfeited the issue.

Although defendant does not cite Supreme Court Rule 451(c) (177 Ill. 2d R. 451(c)), we note that rule's "exception to the waiver rule for substantial defects applies when there is a grave error or when the case is so factually close that fundamental fairness requires that the jury be properly instructed." *Hopp*, 209 Ill. 2d at 7. Neither factor is a consideration in this case.

The instruction the jury received was adequate to encompass consideration of the evidence in question. In addition to specific instructions bearing upon defendant's mental state, the jury was instructed that it could consider, in mitigation, "[a]ny other reason supported by the evidence why the defendant should not be sentenced to death." Continuing, the instruction informed the jury: "Where there is evidence of a mitigating factor, the fact that such mitigating factor is not a factor specifically listed in these instructions does not preclude your consideration of the evidence."

In *People v. Kirchner*, 194 Ill. 2d 502 (2000), this court considered the efficacy of an identical catch-all instruction. In that case, defendant claimed he was improperly denied a specific instruction pertaining to the likelihood of his rehabilitation. Defendant claimed reversible error because the trial court refused to instruct the jury that mitigating factors include that "[t]he defendant may be rehabilitated or restored to useful citizenship." *Kirchner*, 194 Ill. 2d at 554-55. In *Kirchner,* this court determined that a new sentencing hearing was not necessary, holding that the catch-all instruction was adequate, under the facts of that case, to apprise the jury that it could consider defendant's potential for rehabilitation. *Kirchner*, 194 Ill. 2d at 556-57.

In this case, Kendra Moses, defendant's mitigation expert, testified at length about the hardships and abuses defendant suffered in his formative years. Moreover, the jury heard extensive evidence regarding defendant's mental condition–be it a mental illness or personality disorder–and the origins of that condition. At least three of the testifying experts, including the State's expert, believed that defendant's childhood experiences of abuse and/or neglect were contributing factors in the formation of his current mental makeup, a conclusion that few laymen would find surprising. That testimony was inextricably tied to defendant's argument that his mental condition militated against the imposition of the death penalty. We

have no doubt that the jury considered defendant's formative experiences–particularly his mother's temporary withdrawal, his sexual experience with his sister, and childhood teasing and bullying–and, correlatively, his mental condition, and appropriately weighed them against the details of eight brutal murders and the terrorism of J.A.

We have thoroughly reviewed the evidence in this case. Assuming, *arguendo*, that the abuse defendant suffered would qualify as "extreme," we are confident that the jury's verdict would not have been otherwise had the instruction been given with the proposed language. See *Kirchner*, 194 Ill. 2d at 557, quoting *Alvine*, 173 Ill. 2d at 290 ("An error in a jury instruction is harmless if the result of the trial would not have been different if a proper instruction had been given").

## Apprendi *Issue*

Finally, defendant argues that the Illinois death penalty statute violates principles announced in *Apprendi* in that it does not require application of the reasonable doubt standard at the second stage of capital sentencing proceedings. We have addressed and rejected that argument in *People v. Thompson*, 222 Ill. 2d 1, 52-54 (2006), *People v. Mertz*, 218 Ill. 2d 1, 93-94 (2005), and *People v. Ballard*, 206 Ill. 2d 151, 202-05 (2002). Defendant raises no new arguments in this respect, and we decline to revisit the issue.

## CONCLUSION

We find in defendant's arguments no basis for reversal or remand. Although defendant has not specifically argued that the evidence is insufficient to support his death sentence, it is our responsibility in every death penalty case to consider the appropriateness of the sentence. *People v. Heard*, 187 Ill. 2d 36, 85 (1999). After careful consideration of the evidence adduced, we concur in the jury's determination that death is the appropriate penalty. Pursuant to section 9–1(i) of the Criminal Code (720 ILCS 5/9–1(i) (West 2004)), we find no fundamental injustice in this case. For the reasons stated herein, we affirm the defendant's conviction and death sentence. We direct the clerk of this court to enter an order setting Tuesday, May 8, 2007, as the date on which the sentence of death shall be carried out. Defendant shall be executed in the manner

provided by law. 725 ILCS 5/119–5 (West 2004). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed.*

JUSTICE KILBRIDE, concurring in part and dissenting in part:

I agree with the majority's analysis of virtually all the issues presented in this case, including its examination of the questions impacting on the guilt phase of defendant's trial. I part company only with the majority's view that during the sentencing phase the jury need not be specifically instructed on the mitigating effect of a defendant's history of abuse, as expressly required by subsection (c)(6) of section 9–1 (720 ILCS 5/9–1(c)(6) (West 2004)). Slip op. at 76.

Subsection (c)(6) is one of a parcel of statutory protections enacted following the spate of seriously flawed capital cases that prompted the current moratorium on executions in this state. This subsection states:

> "The court shall consider, or *shall instruct* the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty. *** Mitigating factors may include but need not be limited to the following:
>
> * * *
>
> (6) *the defendant's background includes a history of extreme emotional or physical abuse*[.]" (Emphases added.) 720 ILCS 5/9–1(c)(6) (West 2004).

After noting that this subsection was in effect at the time of defendant's trial, the majority concludes that he has forfeited this claim. Slip op. at 76. Ordinarily, I would agree that it is unnecessary to conduct a new sentencing hearing solely due to the omission of a specific mitigating factor as long as a catchall instruction is included informing the jury that the failure to list a particular mitigating factor " 'does not preclude [the jury's] consideration of the evidence' " (slip op. at 76). See *Kirchner*, 194 Ill. 2d at 556-57. In this instance, however, I am otherwise persuaded by the historical underpinnings

-78-

of the statutory changes at issue. The legislature enacted those changes to reform our seriously flawed capital punishment system. The legislature's efforts, combined with those of this court (see 188 Ill. 2d Rs. 43, 411, 412(c), 416, 417, 701(b), 714), have effectuated fundamental changes in capital proceedings with the laudable goal of reducing the number of erroneous capital convictions and sentences entered in this state.

With that goal in mind, the legislature added subsection (c)(6), requiring a jury instruction specifically pointing out the need for jurors to consider a defendant's background as a victim of abuse. 720 ILCS 5/9–1(c)(6) (West 2004). The statutory language mandates that the court "*shall*" instruct the jury on the listed mitigating factors, including a history of abuse noted in subsection (c)(6). The plain language added to redress Illinois' troubled capital punishment system demonstrates the legislature's clear intent to differentiate this factor from the myriad of possible mitigation sources encompassed by the catchall instruction relied on by the majority. Slip op. at 76. Thus, where, as here, there was evidence that defendant had undergone emotional and physical abuse as a child, the statute obliged the trial court to instruct the jury on this mitigating factor. Reliance on a catchall instruction does not adhere to the will of the legislature or uphold the spirit of the amendments.

Furthermore, the legislature added another statutory protection to overcome the fundamental defects in our prior capital punishment system. That provision grants this court the authority to vacate a particular death sentence and impose a term of years if that sentence is "fundamentally unjust" (720 ILCS 5/9–1(i) (West 2004)). Here, it is fundamentally unjust to ignore the legislature's clear mandate that juries must be specifically apprised of the relevance of mitigating abuse evidence. Our legislature's capital punishment reforms merit the highest degree of judicial adherence because they are designed to rectify the serious problems in our prior system.

In addition, all the mental-health witnesses in this case agreed that defendant suffered from some type of mental disorder, including possible organic brain disease, although they could not agree on a single diagnosis. Slip op. at 14-18. To submit to a jury the question of whether to impose the death penalty on defendant without strict adherence to the safeguards imposed by both this court and our legislature flies in the face of fundamental justice and undermines these fundamental reform efforts. The absence of the mitigating-

factor instruction in subsection (c)(6) unjustly contravenes the clear intent of our legislature and leaves the jury to resolve the life-and-death issue of imposing the death penalty without the specific guidance of a mitigating factor the legislature has deemed sufficiently critical to single out for express consideration. Here, the evidence of abuse was relegated to the broad, undefined category of nonspecific potential mitigation material, failing to give it the distinct recognition intended by the legislature.

Given the immense gravity of the issues in capital proceedings, I believe both fundamental justice and the reliability of this state's capital punishment system require our courts to apply all legislative and judicial reform measures unwaveringly. If we do not, we risk a recurrence of the tragic circumstances that prompted those reforms. Thus, although I abhor the heinous crimes committed by this defendant, I cannot countenance any erosion of our revised system of capital punishment caused by lax enforcement of the newly minted safeguards. Because the jury was not properly instructed in this case, I would remand this cause for a new sentencing hearing incorporating an instruction specifically noting the mitigating effect of emotional or physical abuse inflicted on defendant. For these reasons, I respectfully dissent from the majority opinion.